UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

FILED
U.S. DIST. COURT
SAVANNAH DIV

Oct 24   9 20 AM '00

CLERK_____
SO. DIST. OF GA.

JAMES CLIFFORD WILLIAMS,
    Defendant/Petitioner,

vs.

UNITED STATES OF AMERICA,
    Plaintiff/Respondent.

CIVIL NO.: **CV400-283**
CRIMINAL NO. CR493-82-12

MOTION TO VACATE, SET ASIDE, OR CORRECT A SENTENCE
PURSUANT TO TITLE 28 U.S.C. §2255

COME NOW, Petitioner JAMES CLIFFORD WILLIAMS (Pro se)[1], moves

this Honorable Court to Vacate the Convictions and Sentences imposed

based on the Facts, Citations, and Arguments set forth in the attached

Memorandum of Law. Petitioner submits this motion pursuant to the

provisions set out in Title 28 U.S.C. §2255. In support of this

Motion, Petitioner submits the following:

1). The convictions and sentences under attack were entered in the

United States District Court, Southern District of Georgia, Savannah

Division.

1. Haines v. Kerner, 404 U.S. 519, 30 L.Ed.2d 652, 92 S.Ct. 594
(1972), Pro se litigants pleadings are to be construed liberally
and held to less stringent standards than formal pleadings drafted
by lawyers; if Court can reasonably read pleadings to state valid
claim on which litigant could prevail, it should do so despite fail-
ure to cite proper legal authority, confusion of legal theories,
poor syntax, and sentence construction, or litigants unfamiliarity
with pleading requirements.

2). The convictions and sentences under attack were entered on March 14, 1994 and on April 11, 1997.

3). The convictions and sentences under attack resulted in a composite sentence of Life, 120 months concurrent, and 60 months consective, followed by 10 years of supervised release and a special assessment of $250.00.

4). The nature of the offenses involved:
    A: Count I. Conspiracy to possess with intent to distribute and to distribute controlled substances, a violation of 21 U.S.C. §846.

    B: Count IV & VI. Carrying a firearm during a drug trafficking offense, a violation of 18 U.S.C. §924(c).

    C: Count V. Possession with intent to distribute cocaine, a violation of 21 U.S.C. §841(a)(1).

    D: Count VII. Possession of a firearm by a convicted felon, a violation of 18 U.S.C. §922(g).

5). Petitioner entered a plea of NOT guilty.

6). Petitioner DID proceed to a trial by jury.

7). Petitioner DID testify at trial.

8). Petitioner filed a direct appeal in behalf of his convictions and sentences.

9). Petitioner's appeals were filed in the United States Court of Appeals for the 11th Circuit Case No. 94-8325, in which the Court of Appeals Vacated the Sentences for Petitioner's drug offenses (count one & five) and remanded the case for resentencing while

affirming the remaining counts four, six, and seven, on January 31, 1997 and for Case No. 97-8394, the Court of Appeals affirmed Petitioner's convictions and sentences on March 9, 1999.

10). Petitioner filed to The United States Supreme Court in behalf of the 11th Circuit Court of Appeals denial of Petitioner's Brief, in which The Supreme Court denied Petitioner's Writ of Certiorari in November, 1999.

11). Petitioner has not previously filed any petitions, applications, or motions with respect to these convictions and sentences in any federal court.

12). Petitioner submits the following grounds to support that Petitioner's convictions and sentences are Illegal, Unconstitutional, and Petitioner is being held Unlawfully:

"GROUNDS"

A. GROUND I: The Government Committed Complete Prosecutorial Misconduct in behalf of Case No. CR493-82-12. A violation of Petitioner's 5th & 6th Constitutional Rights.

B. GROUND II: The District Court Judge Abused Discretion in behalf of Case No. CR493-82-12. A violation of Petitioner's 5th & 6th Constitutional Rights.

C. GROUND III: The District Court Judge Erred by Not Supplying the Definitions of the "Use and Carrying" Prong in the Jury Instructions. A violation of Petitioner's 5th & 6th Constitutional Rights.

3

D.  GROUND IV: The Presentence Investigation Report in behalf of Petitioner is In-Correct in violation of Fed. R. Crim. P. 32.  A violation of Petitioner's 5th Constitutional Right.

E.  GROUND V:  Petitioner was Denied Adequate/Effective Assistance of Trial & Appellant Counsel.  A violation of Petitioner's 6th Constitutional Right.

F.  GROUND VI: In light of the Supreme Court's recent decisions in Apprendi v. New Jersey, 530 U.S.___, 2000 Wl 807189 & Jones v. United States, 530 U.S.___, 2000 WL 217939, Petitioner's Convictions & Sentences are Illegal, Unconstitutional and in violation of Petitioner's 5th & 6th Constitutional Rights.

13). Grounds I, II, III, IV, V, & VI were not previously presented.

14). Petitioner does not have any petition or appeal now pending in any other court.

15). Petitioner was represented at the Trial level by Cletus W. Bergen, II, 223 West York Street, Savannah, Georgia 31401; On Appeals by James R. Beach, 1544 Old Alabama Road, Roswell, Georgia 30076; and by Dwight Feemster, 236 E. Oglethrone Ave., Savannah, Georgia 31401.

16). Petitioner was sentenced on five counts of one indictment in the same court.

17). Petitioner does not have any future sentence to serve after completion of the sentences imposed by the judgment under attack.

4

MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO VACATE, SET ASIDE, OR
CORRECT SENTENCE PURSUANT TO TITLE 28 U.S.C. §2255

The Petitioner, JAMES CLIFFORD WILLIAMS (Williams) (Pro se),
moves this Honorable Court to vacate, set aside, or correct his
sentence pursuant to Title 28 U.S.C. §2255.  In support of this
motion, Petitioner respectfully submits the following:

## JURISDICTION

Pursuant to Title 28 U.S.C. §2255, "[a] prisoner in custody
under sentence of a court establish by Act of Congress claiming the
right to be released upon the ground that the sentence was imposed
in violation of the Constitution or Laws of the United States, or
that the court was without jurisdiction to impose such sentence, or
that the sentence was in excess of the maximum authorized by law,
or is otherwise subject to collateral attack, may move the court
which imposed the sentence to vacate, set aside, or correct the sen-
tence".

## INTRODUCTION

On August 11, 1992, the Petitioner, James Clifford Williams,
was charged with a Possession of Cocaine with Intent to Distribute
in State Court of Chatham County Superior Court, Docket No  CR92-26-26
and recieved 10 years.  On June 30, 1993, the Petitioner and 18 others
were indicted in Federal Court for Case No. CR493-82.  The indictment
charged Williams with:
Count I-Conspiracy to Possess with Intent to Distribute and to Dis-
Controlled Substance, in violation of 21 U S C  §846

5

Count IV & VI- Carrying a firearm during a drug trafficking offense, in violation of 18 U.S.C. §924(c).

Count V- Possession with Intent to Distribute Cocaine, in violation of 21 U S.C. §841(a)(1).

Count VII- Possession of a Firearm by a Conviction Felon, in violation of 18 U.S.C. §922(g).

Williams was represented at trial by court appointed counsel, which began on January 31, 1994. The jury returned guilty verdicts on 5 counts out of 6 on February 3, 1994. A presentenced report was prepared on February 10, 1994. Williams was sentenced to Life, 120 months concurrent, and 60 months consective, followed by 10 years of supervised release and a special assessment of $250.00. A direct appealed was filed and on January 31, 1997, the 11th Circuit Court of Appeals vacated the sentences for Williams' drug offenses (count one and five) and remanded the case for resentencing. On April 2, 1997, a revised presentence report was prepared. On April 11,1997, Williams was sentenced to Life, for counts one and five. Williams Appealed the new sentences in which was denied on March 9, 1999. Williams Writ of Certiorari to the Supreme Court was denied in November, 1999.

6

## EXHIBIT LIST

A-  Al Goldwire's statements dated Octobeer 4, & 8, of 1991.

B-  Lucious Bruce Johnson's statements dated August 7,1992 .

C-  Ronnie Miles statements dated September 29, 1993.

D-  Jonathan D. Kelton's statements dated March 5, 1991.

E-  Jonathan D. Kelton's statements dated March 21 & April 6, 1991.

F-  Kimberly Williams (dated March 4,1991), Tammy Farrow (dated March 14, 1991), Timothy Buttimer (dated March 19, 1991) statements, & Lucious Bruce Johnson's Grand Jury Testimony.

G-  James Clifford Williams Sworn Affidavit.

H-  Lucious Bruce Johnson's statements dated August 13, 1992.

I-  Lucious Bruce Johnson's gave Agent Craig Smith his (Johnson's) belongings on July 29, 1992, and LIED by saying that they belong to James Clifford Williams.

J-  The Execution of the State Search Warrant at 326 Linwood Road.

K-  Lucious Bruce Johnson's statements dated August 17, 1992.

L-  Jonathan D. Kelton's statements of whom worked for him dated June 24, 1993.

M-  Jonathan D. Kelton's statements dated December 2, 1993.

N-  Bubba Daiss statements dated March 7, 1991

7

## ARGUMENT AND CITATION OF AUTHORITY

### ISSUE I

WILLIAMS CONTENDS THAT THE GOVERNMENT COMMITTED
COMPLETE PROSECUTORIAL MISCONDUCT IN BEHALF OF
CASE NO.:CR493-82.  A VIOLATION OF WILLIAMS 5TH
& 6TH CONSTITUTIONAL RIGHTS.

In Giglio v United States, 405 U.S. 150, 153, 92 S.Ct. 763,
765, 31 L.Ed.2d 104 (1972), the Supreme Court said, "[a]s long
ago as Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 341,
79 L.Ed. 791 (1935), this Court made clear that deliberate decep-
tion of a court and jurors by the presentation of known false
evidence is incompatible with 'rudimentary demands of justice'.
This was reaffirmed in Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177,
87 L.Ed. 214 (1942). In Napue v. Illinois, 360 U.S. 264, 79 S.Ct.
1173, 3 L.Ed.2d 1217 (1959), the Court states "[t]he same result
obtains when the State, although not soliciting false evidence
allows it to go uncorrected when it appears. Id at 269, 79 S.Ct.
at 1177'."

(i)  Williams would like the records to reflect that Any and All
Testimony by the Government's Witness Al Goldwire that Williams
sold him (Goldwire) 3 ounces of crack cocaine and 3 ounces of pow-
ered cocaine (T.T.-I-p.15) is Complete Perjury Testimony because
he (Goldwire) NEVER Mention Williams on October 4, 1991, or October
8, 1991, during the Debreifings that were held by the Government
Agents and Williams was not mention until August 25, 1992, after
Williams arrest of August 11, 1992, and when Al Goldwire began to

8

Cooperate with the Government he (Goldwire) was REQUIRED to Tell
Any and All Illegal Activities that he (Goldwire) participated in
up until his (Goldwire) arrest (T.T.-I-pp. 26-28)(Exhibit- A),
and the Government Knew of the Perjury and Knowingly Participated
in the Perjury Testimony. Mesareosh v. United States, 352 U.S. 1,
1 L.Ed.2d 1, 77 S.Ct. 1 (1956), "Truthfulness of Testimony...'The
dignity of the United States Government will not permit the conviction
of any person on tainted testimony'."

(ii)  Williams would like the records to reflect that Any and All
Testimony by the Government Witness Jamie Guzman against Williams
(T.T.-I-pp. 127, 129-144) is Complete Perjury Testimony and the Gov-
ernment Knew of the Perjury and Knowingly participated in the Per-
jury Testimony, when it's a Proven Fact that Jamie Guzman Did Not
start Lying on Williams until he (Guzman) was in between his Plea
Hearing & Sentencing Hearing and once he (Guzman) was caught on the
telephone trying to make a Drug Deal, was his only reason he (Guzman)
went along with the Lies of Agent Craig Smith (T.T.-II-p.9), in which
Guzman testified that he first met Williams in 1991 and that it was
on a Hot afternoon (T.T.-I-pp. 131-134), and that he (Guzman) Dealt
with Williams and the Government Witness & Informant Lucious Bruce
Johnson for about 18 months (T.T.-I-p. 139), but Lucious Bruce John-
son Testified that he (Johnson) first met Jamie Guzman in 1990 in
New York and received Drugs from him (Guzman) for about 6 to 8 months
until his (Johnson's) October 12, 1990 arrest in Albany, New York
(T.T.-II-pp. 40-41), Mesareosh v. United States, 352 U.S. 1, 1 L.Ed.2d
1, 77 S.Ct. 1 (1956), "Truthfulness of Testimony...'The dignity of
the United States Government will not permit the conviction of any
person on tainted testimony'."

9

(iii)#1)Williams would like the records to reflect that the Government's Informant & Key Witness Lucious Bruce Johnson Committed Complete Perjury Testimony by stating that James Williams, Carl Douglass, Godfrey, Ronnie Miles, and himself (Johnson) went on the trip to Fort Stewart in Hinesville, Georgia to pick up a car and pick up a person or collect some money from the person (T.T.-II-p.20), in which on the Debreifing of Lucious Bruce Johnson (CI #SG9-92-X022) on August 7, 1992 by Sgt. J.I. Pennigton, Det. B.L. Smalls, and Det. V.R. Gordon, Lucious Bruce Johnson stated that "James Williams aka. Swinger, Carl Douglass, Godfrey, Marty LNU [who work for Godfrey], Ronnie Miles, Charles Williams aka. Slick, and himself (Johnson) rode to Fort Stewart in a Dodge Alliance K-car and found the black male. (Exhibit-B & C). in`. which shows two more alleged people (Marty LNU & Charles Williams aka. Slick) but after comparing Government Witness Ronnie Miles Trial Testimony shows that Lucious Bruce Johnson Committed Perjury, in which Ronnie Miles Testified that the alleged unknown black male was at the apartment Willingly and Everything was Alright and that All left the apartment besides Martin and himself (Miles) and when all came back Lucious Johnson was with the rest (T.T.-III-pp. 121-122) and the Government NEVER made the Perjury of Material Facts Known to the Jury. United States v. Agurs, 427 U.S. 97, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976), When the prosecution is or should be aware that it is presenting perjured testimony, a strict standard of materiality will be applied, and or conviction will be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.  Conviction obtained by knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the outcome of the trial.

#2)  Williams would like the records to reflect that the Government's
Informant & Key Witness Lucious Bruce Johnson Committed Complete
Perjury Testimony by attempting to place Williams at a alleged seen
where a murder was to have took place (T.T.-II-pp.16-28), and he
(Johnson) Testified that he was Not on the seen of the actual murder
because when he left the alleged place of residence, the allege per-
son was still a live but upon returning the allege person was dead
(T.T.-II-pp.22-24), in which the Government Knew that "Lucious Bruce
Johnson's" Testimony was of Perjury because based on Det. Ricky J.
Dailey Testimony of Lucious Bruce Johnson's statements and the De-
breifing of Government Witness Ronnie Miles that states that Lucious
Bruce Johnson was at the seen of the Actual Killing when the alleged
shots were fired and they were heard also (T.T.-II-pp.206-210), &
(T.T.-III-pp.121-125), and the Government NEVER made the Perjury
of material facts known to the the jury. United States v. Agurs,
427 U.S. 97, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976), When the prosec-
ution is or should be aware that it is presenting perjured testimony,
a strict standard of materiality will be applied, and or conviction
will be set aside if there is any reasonable likelihood that the
false testimony could have affected the judgment of the jury.  Con-
viction obtained by knowing use of perjured testimony must be set
aside if there is any reasonable likelihood that the false testimony
could have affected the outcome of the trial.

#3)  Williams would like the records to reflect that the Government's
Informant & Key Witness Lucious Bruce Johnson Committed Complete
Perjury Testimony by stating that "the alleged unknown black male

11

was dead in the bathtub upon his (Johnson's) arrival back to the
apartment and that We wrapped him up in a wine-colored bedspread
(T.T.-II-pp.23-24), in which on the Debriefing of Lucious Bruce
Johnson (CI #SG9-92-XO22) on August 7, 1992, by Sgt. J.I. Pennington,
Det. B.L. Smalls, and Det. V.R. Gordon, Lucious Bruce Johnson stated
that "upon returning to the apartment the black male had been shot.
The black male had been wrapped in a blanket/bedspread (Exhibit-B & C  ),
and the Government NEVER made the Perjury of Material Facts Known to
the jury. United States v. Agurs, 427 U.S. 97, 49 L.Ed.2d 342, 96 S.Ct.
2392 (1976), When the prosecution is or should be aware that it is
presenting perjured testimony, a strict standard of materiality will
be applied, and or conviction will be set aside if there is any
reasonable likelihood that the false testimony could have affected
the judgment of the jury.  Conviction obtained by knowing use of
perjured testimony must be set aside if there is any reasonable like-
lihood that the false testimony could have affected the outcome of
the trial.

Williams would like the records to reflect that Williams NEVER part-
icipated in the murder of the unknown black male or anyone else and
that by the Complete review of All the records will show that the
Most Culpable of committing the alleged crime would be Lucious Bruce
Johnson and Ronnie Miles whom Admitted to being Actual Participants.

(iv)  Williams would like the records to reflect that the Government's
Informant & Key Witness Lucious Bruce Johnson Committed Complete
Perjury Testimony by stating that Williams was a participant in the

murder of Ricky Spivey (T.T.-II-pp.54-66), in which Lucious Bruce
Johnson Testified that after hearing the pop like a gunshot, he
(Johnson) came through the door and that Williams told him (Johnson)
to go get the Volvo Wagon, and that Danny (Jonathan D. Kelton) was
taking off his gloves and swearing about Spivey kept bothering him
(Danny) and that Williams was breaking up the pistol, but on August
7, 1992, Lucious Bruce Johnson stated that when Danny Kelton walked
out of the paint stall removing a pair of gloves saying "I told him
not to fuck with me" repeatedly, and that Danny Kelton GAVE the Gun
(possibly a .38) to James Williams (Exhibit- B ), in which Jonathan
Danny Kelton another Government Witness stated that Williams killed
Ricky Spivey by shooting him (Spivey) in the back of the head and
that Lucious Bruce Johnson came with a blue boat like tarp and that
they wrapped the body of Ricky Spivey and put it in the Volvo, while
Williams cleaned up the blood and Barshon (Lucious Bruce Johnson)
washed down the paint booth with a hose and all that got blood on
it (T.T.-II-pp.286-290), but on March 5, 1991, the Government's Wit-
ness Jonathan D. Kelton stated to the Bloomingdale Police Officers
that he (Danny Kelton) Did Not Kill Ricky Spivey and Did Not Know
who Killed Ricky Spivey (Exhibit- D ) and (Exhibt- E ) and
the Government NEVER made the Perjury of Material Facts Known to
the jury. United States v. Agurs, 427 U.S. 97, 49 L.Ed.2d 342, 96 S.Ct.
2392 (1976), When the prosecution is or should be aware that it is
presenting perjured testimony, a strict standard of materiality will
be applied, and or conviction will be set aside if there is any reas-
able likelihood that the false testimony could have affected the jud-
gment of the jury. Conviction obtained by knowing use of perjured test-
imony must be set aside if there is any reasonable likelihood that the
false testimony could have affect the outcome of the trial.

13

Williams would like the records to reflect that Williams NEVER participated in the murder of Ricky Spivey or Anyone Else and that by the Complete review of All the records will show that the MOST Culpable are Jonathan D. Kelton (Danny)(Exhibit- F    ) and Lucious Bruce Johnson whom Admitted to being Actual Participants to the Alleged Crime.....

(v)  Williams would like the records to reflect that the Government Informant & Key Witness Lucious Bruce Johnson Committed Perjury Testimony by stating that he (Johnson) First met Jamie Guzman in 1990 in New York (T.T.-II-p.40) and Jamie Guzman Testified that the First time he met Williams was in 1991 and that it was on a Hot afternoon (T.T.-I-pp.131-134) and that he (Guzman) Dealt with Williams and Government Informant & Key Witness Lucious Bruce Johnson for about 18 months (T.T.-I-p.139), and the Government NEVER made the Perjury of Material Facts Known to the jury. United States v. Agurs, 427 U.S. 97, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976), When the prosecution is or should be aware that it is presenting perjured testimony, a strict standard of materiality will be applied, and or conviction will be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.  Conviction obtained by knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affect the outcome of the trial.

14

(vi) Williams would like the records to reflect that the Government
Informant & Key Witness Lucious Bruce Johnson Committed Perjury
Testimony by stating that for about 6 to 8 months he (Johnson) and
Williams was living in Albany, New York selling crack cocaine until
his (Johnson's) arrest in October of 1990 and that the Source of
Supply (Cocaine) was Jamie Guzman from New York and that he (Johnson)
stayed in Jail (in Albany, New York) for about Sixty to Seventy Days
which would put his (Johnson's) Release Date from Jail around December
of 1990 (T.T.-II-pp.40-42), and Lucious Bruce Johnson Testified that
he and Williams was getting Drugs (Cocaine) from Matthew Harrington
in 1990 in Savanna, Ga. that was being sold by him (Johnson) and
Williams until Matthew Harrington's arrest of December of 1990
(T.T.-II-pp.43-45), in which was Impossible and the Government NEVER
made the Perjury of Material Facts Known to the jury. United States v.
Agurs, 427 U.S. 97, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976), When the
prosecution is or should be aware that it is presenting perjured
testimony, a strict standard of materiality will be applied, and or
conviction will be set aside if there is any reasonable likelihood
that the false testimony could have affected the judgment of the
jury. Conviction obtained by knowing use of perjured testimony must
be set aside if there is any reasonable likelihood that the false
testimony could have affect the outcome of the trial.

(vii) Williams would like the records to reflect that the Government
Witness Agent Madeleine Pinckney Committed Complete Perjury Testimony
by stating that Williams made the Alleged Statements she (Pinckney)
Testified to (T.T.-II-pp.218-238), in which Williams NEVER stated

15

such Alleged Statements and Williams Continued to Request for the
Right to have a Lawyer, in which was Denied and Williams was told
by Agent Craig Smith to just sign the Damn card, and the Government
NEVER Question Agent Craig Smith about the False Alleged Statements
(Exhibit- G   ), and the Government Knew that No Such Statement was
Recorded or Signed by Williams. United States v. Mathurin, 148 F.3d
68 (2nd Cir. 1998), Unwarned statements that are otherwise voluntary
within the meaning of Fifth Amendment must nevertheless be excluded
from evidence under Miranda. U.S.C.A. Const. Amend. 5.
Williams would like the records to reflect that "The due process
clause of the Fifth Amendment authorizes traditional equal protect-
ion analysis of federal rules and therefore has a substantive as
well as procedural aspect. Hampton v. Mow Sun Wong, 426 U.S. 88,
96 S.Ct. 1895, 48 L.Ed.2d 495; United States v. Salerno, 481 U.S.739,
107 S.Ct. 2095, 95 L.Ed.2d 697; Also see Rochin v. California,342 U.S.
165, 96 L.Ed. 183, 72 S.Ct. 205 (1952), Substantive due process refers
to certain actions that the government may not engage in, no matter
how many procedure safeguards it employs.....

(viii)  Williams would like the records to reflect that the Government
Witness Joseph Kelton Committed Complete Perjury Testimony by stating
that he (Joseph Kelton) met Williams in the Fall of 1990 at his
brother's (Danny Kelton's) shop and that Williams was there (at the
shop) Almost Every Working Day and that Williams makes his living
selling drugs (T.T.-II-pp.255-256), but the Government Informant &
Key Witness Lucious Bruce Johnson Testified that for about 6 to 8
months he (Johnson) and Williams was living in Albany, New York selling
crack cocaine until his (Johnson's) arrest in October, of 1990

16

(T.T.-II-pp.40-42) and the Government NEVER made the Perjury of Mat-
erial Facts Known to the jury. United States v. Agurs, 427 U.S. 97,
49 L.Ed.2d 342, 96 S.Ct. 2392 (1976), When the prosecution is or
should be aware that it is presenting perjured testimony, a strict
standard of materiality will be applied, and or conviction will be
set aside if there is any reasonable likelihood that the false test-
imony could have affected the judgment of the jury.  Conviction obtain-
ed by knowing use of perjured testimony must be set aside if there
is any reasonable likelihood that the false testimony could have
affect the outcome of the trial.

(ix)  Williams would like the records to reflect that Any and All
Testimony by the Government Witness Joseph Kelton that Williams Part-
icipated in Any Type of Drug Sales at Danny's Auto Body & Paint Shop
or Supplied Any Drugs for Sell is Perjury Testimony (Exhibit- G    ).

(x)    Williams would like the records to reflect that the Government's
Witness Jonathan D. Kelton (Danny) Committed Complete Perjury Testimony
by stating that he (Danny) met Williams in the Fall of 1990 and that
Williams received money  for the sale of drugs, nor Did Williams sell
Any Type of Drugs at Daniel Kelton's Shop (T.T.-II-pp.280-281), when
Lucious Bruce Johnson (the Government Informant & Key Witness) Test-
ified that for about 6 to 8 months he (Johnson) and Williams was in
Albany, New York living and selling crack cocaine until his (Johnson's)
arrest in October, of 1990 (T.T.-II-pp.40-42) and the Government
NEVER made the Perjury of Material Facts Known to the jury.  ...........
Mesareosh v. United States, 352 U.S. 1, 1 L.Ed.2d 1, 77 S.Ct. 1 (1956),
"Truthfulness of Testimony...'The dignity of the United States Government
will not permit the conviction of any person on tainted testimony'."
 (Exhibit-G & H )

17

(xi)    Williams would like the records to reflect that the Government's
Witness Jonathn D. Kelton (Danny) Committed Complete Perjury Testimony
by stating that Williams made an offer for $1,000.00 to get rid of
Mr. Ricky Spivey or Anybody Else (T.T.-II-pp.286-287), and Williams
NEVER killed anybody, nor was Williams around when Anyone was killed
nor Did Williams talk to Jonathan D. Kelton about having Anyone killed
(T.T.-II-pp.287-294)(Exhibit- G ), in which Lucious Bruce Johnson
(the Government Informant & Key Witness) Testified that after hearing
the pop like a gunshot, he (Johnson) came through the door and Williams
told him (Johnson) to go get the Volvo Wagon, and that Danny (Jonathan
D. Kelton) was taking off his gloves and swearing about Spivey kept
bothering him (Danny) and that Williams was breaking up the pistol,
but on August 7, 1992, Lucious Bruce Johnson stated that when Danny
Kelton walked out of the paint stall removing a pair of gloves saying
"I told him not to fuck with me  repeatedly", and that Danny Kelton
GAVE the Gun (possibly a .38) to James Williams (Exhibit- B  ), in
which Jonathan D. Kelton another Government Witness stated that Willi-
ams killed Ricky Spivey by shooting him (Spivey) in the back of the
head and that Lucious Bruce Johnson came with a blue boat like tarp
and that they wrapped the body of Ricky Spivey and put it in the
Volvo, while Williams cleaned up the blood with a hose and all that
got blood on it (T.T.-II-pp.286-290), but on March 5, 1991, the Gov-
ernment's Witness Jonathan D. Kelton stated to the Bloomingdale Police
Officers that he (Danny Kelton) Did Not Kill Ricky Spivey and Did Not
Know who Killed Ricky Spivey (Exhibit- D  ) and (Exhibit- E  ) and
the Government NEVER made the Perjury of Material Facts Known to the
jury. United States v. Agurs, 427 U.S. 97, 49 L.Ed.2d 342, 96 S.Ct.

18

2392 (1976), When the prosecution is or should be aware that it is presenting perjured testimony, a strict standard of materiality will be applied, and or conviction will be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Conviction obtained by knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affect the outcome of the trial.

Williams would like the records to reflect that Williams NEVER participated in the murder of Mr. Ricky Spivey or Anyone Else and that by the Complete review of All the records will show that the MOST Culpable are Jonathan D. Kelton (Danny)(Exhibit- F ) and Lucious Bruce Johnson whom Admitted to being Actual Participants to the Alleged Crime....

(xii)  Williams would like the records to reflect that Any and All Testimony by the Government Witness Ronnie Miles that Williams participated in or knew of Any murder is Perjury Testimony (Exhibit-G ).

(xiii)  Williams would like the records to reflect that Any and All Testimony by ALL of the Government Witnessess that Williams was a Major Drug Dealer and that Williams Supplied Large Quantity is Perjury Testimony (Exhibit- G ).

Yick Wo v. Hopkins, 118 U.S. 356, 30 L.Ed. 220, 96 S.Ct. 1064 (1886), Case in which the Supreme Court coined the term "Evil Eye and an Uneven Hand."

For the Reasons set forth in Issue I, the Guilty Verdicts for Counts One, Four, Five, and Six of the Indictment should be Vacated or in Alternative an Evidentiary Hearing is Required.

19

ISSUE II

WILLIAMS CONTENDS THAT THE DISTRICT COURT ABUSED
DISCRETION IN BEHALF OF CASE NO. CR493-82-12,
A VIOLATION OF WILLIAMS 5TH & 6TH CONSTITUTIONAL RIGHTS.

#1. Williams would like the records to reflect that the District
Court Abused Discretion by Denying Williams Rule 29 Motion for
Counts #4 & #6 (18 U.S.C. §924 (c)(1)(Carrying a firearm during a
drug trafficking offense), when the Indictment FAIL to Allege Any
Type  or Caliber of Weapon and the Fact that the Government FAIL
to Produce said Caliber of Weapon or Any Type of Weapon to Obtain
the Guilty Verdict. United States v. Lopez, 2 F.3d 1342 (5th Cir.
1993), #1). Each count of indictment must stand on its own and can-
not base its validity on allegations of any other count not specifi-
cally incorporated.  #2). Generally, failure of indictment to detail
each alement of charged offense is fatal defect.
United States v. Taylor, 54 F.ed 967 (1st Cir. 1995), To convict
under statue prohibiting carrying of firearm during and in relation
to any crime of violence, gun must be real, but need not be loaded
or operable.

#2. Williams would like the records to reflect that the Caliber of
Weapon and Weapon Type for Counts #4 & #6 is an essential element
of the charged crime, a violation of 18 U.S.C. §924 (c)(1)(Carrying
a firearm during a drug trafficking offense), and by the Government's
FAILURE to Allege the Type or Caliber in the Indictment was a viol-
ation of Williams 5th & 6th Constituional Rights. United States v.
Steele, 117 F.3d 1231 (11th Cir. 1997), Each essential element of
offense must be alleged in indictment.
United States v. Cochran, 17 F.3d 56 (3rd Cir. 1994), Indictment that

20

fails to charge all essential elements of crime must be dismissed.
Rochin v. California, 342 U.S. 165, 96 L.Ed. 183, 72 S.Ct. 205
(1952), Substantive due process refers to certain actions that the
government may not engage in, no matter how many procedural safe-
guards it employs.

#3. Williams would like the records to reflect that the District Court
Abused Discretion by Denying Williams Rule 29 Motion for Count #7 (18 U.
S.C. §922 (g)(1)(Possession of a firearm by a convicted felon)), when
in Fact Agent Craig Smith became in the Possession of said firearm in
Count #7, Only by the Government's Informant & Key Witness Lucious Bruce
Johnson and it was NEVER Established that Williams "Knowingly Possessed
said firearm in Count #7, by Agent Craig Smith's Own Trial Testimony
(T.T.-III-pp. 62-63). (Ex.- G ·). United States v. Hitt, 981 F.2d
422 (9th Cir. 1992), Where evidence is of very slight if any probative
value, it is abuse of discretion to admit it if there is even modest
likelihood of unfair prejudice or small risk of misleading jury.
Thompson v. Calderon, 109 F.3d 1358 (9th Cir. 1996), Prosecutor may
not obtain criminal conviction through use of false evidence.
Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684, In the
judicial application of the due process clause, a balancing of relev-
ant  and conflicting factors is a necessary process.

For the Reasons set forth in Issue II, The Guilty Verdicts for Counts
Four, Six, and Seven of the Indictment should be Vacated or in Alter-
native an Evidentiary Hearing is Required....

21

## ISSUE III

WILLIAMS CONTENDS THAT THE DISTRICT COURT ERRED BY NOT
SUPPLYING THE DEFINITIONS OF THE " USE AND CARRYING"
PRONG IN THE JURY INSTRUCTIONS. A VIOLATION OF WILLIAMS
5TH & 6TH CONSTITIONAL RIGHTS.

#1. Williams would like the records to reflect that Congress used

two terms ("use"and"carrying") because it intended each term to have

a particular, nonsuperfluous meaning. While a broad reading of "use"

undermines virtually any function for "carry", a more limited, active

interpretation of "use" preserves a meaningful role for "carries"

as an alternative basis for a charge. Under the interpretation, a

firearm can be used without being carried, e.g , when an offender

has a gun on display during a transaction, or barters with a firearm

without handling it; and a firearm can be carried without being used,

e.g., when an offender keeps a gun hidden in his clothing throughout

a drug transaction. Bailey v. United States, 516 U.S.___, 133 L.Fd.2d

472, 116 S.Ct.____ 501 (1995), Conviction of use of firearm, for

purposes of mandatory sentencing provision of 18 U.S.C. §924(c)(1),

held to require showing of active employment of firearm such that

firearm is operative factor in relation to predicate offense.

#2. Williams would like the records to reflect that the Jury Instr-

uctions, states for the Third Fact that MUST be Proven for a person

to violate 18 U.S.C. §924(c)(1) is "That the defendant Knowingly used

or carried the FIREARM described in the indictment while committing

such drug trafficking offense, " in which the District Court Erred

by Not supplying the definitions of the "use" and "carrying" prong

in the Jury Instructions and there is No such Firearm alleged in

Counts Four or Six to Justify a violation of §924(c)(1).and Williams

was Not arrested with Any Type of Firearm and that Williams NEVER
Own Any Type of Firearm. United States v. Cartwright, 6 F.3d 294
(5th Cir. 1993), Jury charge must be both legally accurate and fact-
ually supportable; court may not instruct jury on charge that is
not supported by evidence.

#3. Williams would like the records to reflect that Williams can
not be convicted for violation of 18 U.S.C. §924(c)(1), for mere
possession of a firearm. United States v. Baker, 78 F.3d 1241 (7th Cir.
1996), Defendant cannot be convicted of using or carrying firearm
in relation to drug trafficking crime merely for possessing firearm.

#4. Williams would like the records to reflect that by the District
Court's FAILURE to Supply the definitions of "use" and "carry"
pursuant to 18 U.S.C. §924(c)(1), to the Trial Jury nor was the
Alleged Type Firearm supplied in Counts Four or Six in the Indictment,
in which was a Complete Abuse of Discretion by the District Court
and a Violation of Williams 5th & 6th Constitutional Rights. Hampton
v. Mow Sun Wong, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495: United
States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697,
"That due process clause of the Fifth Amendment autorizes traditional
equal protection analysis of federal rules and therefore has a sub-
tantive as well as procedural aspect.;  Also see Rochin v. Califorina,
342 U.S. 165, 96 L.Ed 183, 72 S.Ct. 205 (1952), Subtantive due process
refers to certain actions that the government may not engage in, no
matter how many procedural safeguards it employs.; Bartkus v. Illinois,
3 L.Ed.2d 684, In the judicial application of the due process clause, a
balancing of relevants and conflicting factors is a necessary process.

For the Reasons set forth in Issue III, counts Four and Six of the Indictment should be Vacated or in Alternative an Evidentiary Hearing is Required...

## ISSUE IV

WILLIAMS CONTENDS THAT THE PRESENTENCE INVESTIGATION REPORT IN BEHALF OF "WILLIAMS" IS IN-CORRECT IN VIOLATION OF FED.R.CRIM.P.32.  A VIOLATION OF "WILLIAMS" 5TH CONSTITUTIONAL RIGHTS.

#1. Williams would like the records to reflect that on page #4, paragraph #2 & #4 of the P.S.I. Report is Falsified Information because Williams NEVER distributed multi-kilograms quantities of cocaine hydrochloride and cocaine base in the Southern District of Georgia or Any where else;  (B) Williams NEVER was the Head of Any Organization, nor was he (Williams) the Leader of such; (C) Williams NEVER supplied Matthew Harrington with cocaine or cocaine base; and (D) Carl Douglas (Karl Anthony Escoffery), Jonathan Daniel Kelton, Jaime Guzman, Ronnie Miles, Enrique Rutledge, or Parrish Shield, DID NOT Distribute illegal drugs for Williams. (Exhibit- G -James Clifford Williams Sworn Affidavit).

#2. Williams would like the records to reflect that on pg. #5, paragraph #5, #6, #7, & #8 of the P.S.I. Report is Falsified Information because (A) Williams NEVER had a source of cocaine in New York known as Godfrey LNU, and Williams NEVER obtained one-half to one kilogram of cocaine from Godfrey LNU at Any Time;  (B) Williams NEVER stated that Thomas would have been killed if he had not escaped;  (C) Williams

DENY Any and All participation in paragraph #7; and (D) Williams
DENY Any and All participation in paragraph #8. (Exhibit- G -).

#3. Williams would like the records to reflect that on pg. #6, para-
graph #9, #10, & #11 of the P.S.I. Report is Falsified Information
because (A) Williams DENY Any and All participation in paragraphs
#9, #10, & #11. (Exhibit- G -).

#4. Williams would like the records to reflect that on pg. #7, para-
graph #12, #13, #14, & #15 of the P.S.I. Report is Falsified Infor-
mation because (A) Williams DENY Any and All participation in para-
graphs #12, #13, #14, & #15. (Exhibit- G -).

#5. Williams would like the records to reflect that on pg. #8, para-
graphs #16, #17, #19, & #20 of the P.S.I. Report is Falsified Infor-
mation because (A) Williams DENY Any and All participation in para-
graphs #16, #17, #19, & #20. (Exhibit- G -).

#6. Williams would like the records to reflect that on pg. #9, para-
graphs #23, #26, & #27 of the P.S.I. Report is Inaccurate and Falsi-
fied Information because paragraph #23 should be Base Offense Level
of 12; paragraphs #26 & #27 is Falsified Information because (A) Williams
DENY Any and All Information in paragraphs #26 & #27. (Exhibit- G -).

#7. Williams would like the records to reflect that on pg. #12,
paragraph #51 of the P.S.I. Report is Inaccurate Information because
Any use of 21 U.S.C. §841(b)(1)(A) is Incorrect based on the Fact
Williams was NEVER Indicted pursuant to the enhancement provisions.

#8. Williams would like the records to reflect that on pg. #13, paragraph #52 of the P.S.I. Report should be Total Base Offense Level of 12 for Counts One and Five and a Criminal History Category of III, in which the Guideline calls for a Sentence Range of 15-21 Months Imprisonment. (See Apprendi v. New Jersey, 530 U.S.___, 2000 Wl 807189 (U.S. June 26, 2000) & Jones v. United States, 530 U.S. ___, 2000 WL 217939 (U.S. June 29, 2000), and United States v. Barrington, 662 F.2d 1046,1054, "the ambiguity should be resolved in favor of lenity." ).

#9. Williams would like the records to reflect that on pg. #13, paragraph #53 & #54 of the P.S.I. Report is Incorrect Information because paragraphs #53 & #54 should be a term of Three years of supervised release for counts one and five pursuant to 18 U.S.C. § 3583(b)(2) and NOT the ten years Williams now have. Park v. United States, 832 F.2d 1244 (11th Cir. 1987), #1. Due process is violated when information on which defendant is sentenced is materially untrue or is misformation. #2. Government must prove facts in presentencing report by preponderance of evidence; United States v. Manotas-Mejia, 824 F.2d 360 (5th Cir. 1987), Failure of district court to correct any factual inaccurracy in presentence investigation report maybe raised for first time on appeal and requires resentencing; United States v. Arefi, 847 F.2d 1003 (2nd Cir. 1988), Even if a misstatement in a sentencing report is "harmless" and does not require resentencing, it must still be corrected or clarified;

Williams would like to express that "a presentence report is not evidence", <u>United States v. Holt,</u> 969 F.2d 685 (8th Cir. 1992); <u>United States v. Randolph,</u> 101 F.3d 607 (8th Cir. 1996), Once challenged, presentence report (PSR) is not evidence and is not a legally sufficient basis for making findings on contested issue of material fact.

For the Reasons set forth in Issue IV, the Presentence Report should be Classified as Inaccurate Information and a Order should be Directed to the Probation Officer to Correct the P.S.I. Report, to be according to Fed.R.Crim.P.32, and within the Constitution of the 5th Amendment.

## ISSUE V

### WILLIAMS CONTENDS THAT HE WAS DENIED ADEQUATE/EFFECTIVE ASSISTANCE OF TRIAL & APPELLANT COUNSELS. A VIOLATION OF WILLIAMS 6TH CONSTITUTIONAL RIGHT.

Williams contends that he was denied adequate/effective assistance of counsels. The errors committed by counsel fell outside the range of professionally acceptable performance and there is a reasonable probability that, but for counsels errors, the result of the proceeding would have been different. See United States v. Smith, 915 F.2d 959, 963 (5th Cir. 1990)(quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2064).

The Sixth Amendment to the United States Constitution guarantees a defendant in a Criminal proceeding the right to Counsel Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799; The right to counsel is a fundamental right, Argersinger v. Hamlin, 407 U.S. 25, 29-33, 92 S.Ct. 2006, 2008-10, 32 L.Ed.2d 530

27

(1972), and necessarily implicates the right to effective assis-
tance of counsel.  The requirement that a defendant receive effect-
ive assistance of counsel is Constitutionally Mandated. U.S. Cons-
titution Amend. VI: Reece v. Georgia, 350 U.S. 85, 90 (1955)(the
effective assistance of counsel is a Constitutional requirement of
due process of law); McMann v. Richardson, 397 U.S. 759, 771 & n.14,
25 L.Ed.2d 763, 90 S.Ct. 1441 (1970)(the right to counsel is the
right to effective assistance of counsel).  The text of the Sixth
Amendment itself suggests as much.  The Amendment requires not merely
the provision of counsel to the accused, but "Assistance", which is
to be "For His Defense".  In some cases the performance of counsel
is so inadequate that ineffect, No Assistance of Counsel is provide.
Clearly in such cases the defendant's Sixth Amendment right to have
Assistance of counsel is denied. United States v. Decoster, 624 F.2d
196, 219 cert. denied, 444 U.S. 944, 62 L.Ed.2d 311, 10 S.Ct. 302
(1979).

     The Substance of the Constitution's guarantee of the effective
assistance of counsel is illumnated by reference to its underlying
purpose.  The Supreme Court has consistently adhered to Justice
Sutherland's observation in Powell v. Alabama, 287 U.S. 45, 71, 53
S.Ct. 55, 77 L.Ed. 158 (1932), that when assistance of counsel is
required, that assistance must be "effective" rather than Pro forma.
See Evitts v. Lucey, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 674,
104 S.Ct. 2052 (1984); Wainwright v. Torna, 455 U.S. 586 (1982)(Per
Curiam).

     The Sixth Amendment provides that "[i]n all criminal prosecut-
ions, the accused shall enjoy the right to have the assistance of

counsel for his defense." This right allows for more than just a
live Lawyer sitting next to the defendant; a defendant has a right
to counsel rendering reasonably effective assistance. See also
Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984) This
Constitutional provision serves to insure that the knowledge and
skills of an attorney are available to assist a defendant to afford
him "ample opportunity to meet the case of the prosecution" Strick-
land, 466 U.S. at 684. The right to effective assistance of counsel
extends to every aspect of the case, Pre-Trial, Trial, Sentencing,
and Appeal.

Unless a defendant charged with a serious offense has counsel
able to invoke the procedural and substantive safeguards that dis-
tinguish our system of justice, a serious risk of injustice infects
the Court procedures itself. For that reason, the Supreme Court
has held squarely, that the right to counsel guaranteed by the Con-
stitution is a right to the "effective assistance of counsel." See
United States v. Cronic, 466 U.S. 648, 654, 80 L.Ed.2d 657, 104 S.Ct.
2039 (1984), Absent competent counsel, ready and able to subject
the prosecution's case to the crucible of meaningful adversarial
testing", there can be no guarantee that the adversarial system will
fuction properly to produce just and reliable results. Cronic, Id.,
466 U.S. at 656; See Strickland supra, 466 U.S. at 684, 687...

(i)   Williams was Denied Adequate/Effective Assistance of Counsel
in that Trial Counsel FAILED to file a "Motion to Dismiss Counts
One, Three, Four, Five, and Six of the Indictment for Case No. CR493-82
With Prejudice" after the Trial Jury had been Sworn in, based on
FACTS that ALL of the Essential Elements where Not Alleged by the

29

Grand Jury to Form a Legal Indictment, in which the Drug Amount was
NEVER Determine, nor was the Caliber of Weapon Determine or Alleged,
and  the Sentencing Factor for the Drug Counts were Not Alleged in
the Indictment. United States v. Steele, 117 F.3d 1231 (11th Cir.1997),
Each essential element of offense must be alleged in indictment.
United States v. Cochran, 17 F.3d 56 (3rd Cir. 1994), Indictment that
fails to charge all essential elements of crime must be dismissed.

(ii)   Williams was Denied Adequate/Effective Assistance of Counsel
in that Trial Counsel FAILED to Produce the DEA-6's Reports of Gov-
ernment Witness Al Goldwire's statements dated October 4, 1991, and
October 8, 1991, that would have shown the Trial Jury that Al Gold-
wire's Testimony was based on PERJURY to receive Benfits from the
Government because he (Goldwire) NEVER Mention Williams until August
25, 1992, after Williams August 11th, 1992, arrest and the Government
Knew that when Al Goldwire began to Cooperate with the Government, he
(Goldwire) was REQUIRED to Tell about Any and All Illegal Activities
that he (Goldwire) Participated in and with Whom he Participated with
up until his (Goldwire's) arrest, in which Counsel should have made
apart of Williams Defense Exhibits and should have been brought out
in Court (Exhibit- A ).

(iii)  Williams was Denied Adequate/Effective Assistance of Counsel
in that Trial Counsel was Intimidate by the District Court Judge and
Trial Counsel Discontinued Questioning of the Government Witness
Al Goldwire  Completely about why he (Goldwire) NEVER Mention Williams
in the Beginning of his Debriefing, in which was supposed to be True
and Correct of All of his Drug Dealings and when Trial Counsel Re-
cross Al .Goldwire Trial Counsel began Questioning about Lucious Bruce

30

Johnson (the Government Informant & Key Witness) children and if
he (Goldwire) was the children Godfather, inwhich had Nothing to
do with Williams Case or Defense (Exhibit- A)(T.T.-I-pp.26-29).

(iv)   Williams was Denied Adequate/Effective Assistance of Counsel
in that Trial Counsel FAILED to show the Trial Jury the PERJURY
Testimony of the Government Witness Jamie Guzman, in which he (Guzman)
stated that he First met Williams in 1991 on a Hot afternoon (T.T.-
I-pp.131-134), and that he Dealt (Sold Drugs to Williams) with Williams
and Lucious Bruce Johnson for about 18 months (T.T.-I-p.139), in which
Lucious Bruce Johnson's (the Government Informant & Key Witness)
PERJURY Testimony was that he (Johnson) First met Jamie Guzman in 1990,
in New York and received Drugs from him (Guzman) until his (Johnson's)
October 12, 1990, arrest in Albany, New York (T.T.-II-p.40)..

(v)   Williams was Deined Adequate/Effective Assistance of Counsel
in that Trial Counsel FAILED to Produce the DEA-6 Report dated August
4, 1992 of the Government Informant & Key Witness Lucious Bruce Johnson
that stated on July 29, 1992, he (Johnson) Allegely turned over to
Government Witness Agent Craig Smith which was the Evidence the Gov-
ernment Used in Williams Trial to Convict Williams for Case No. Cr493-82
(Exhibit- I & J), and the Only Evidence that Linked Williams to the
Alleged Contraband was the PERJURY Testimony of Lucious Bruce Johnson
(the Government Informant & Key Witness) to whom the items Belong to
and whom Placed the items in said founded places (Please keep in mind
that Williams Girlfriends I.D. was picked up by Johnson when he was
at the residence)(T.T.-III-pp.10-13) and (T.T.-III-pp.62-63), but what

is Most Puzzeling is that Lucious Bruce Johnson (the Government In-
formant & Key Witness) Did Not Talk about Any Murders until August
7, 1992 and Trial Counsel NEVER Raised the Issue of Fact that Lucious
Bruce Johnson Committed Perjury Testimony against Williams about
"Big Time Drug Dealings and Murders" to Pass his (Johnson's) Criminal
Activities off on Williams and he (Johnson) ¨had¨ spoke about Williams
told a man by the name of Frank to leave the building in the DEA-6
Report of August 7, 1992 (T.T.-II-pp.58-59)(Exhibit- B & K ),but
Danny¯Kelton NEVER had a guy listed as "FRANK" that worked for him (Ex-L).

(vi)   Williams was Denied Adequate/Effective Assistance of Counsel
in that Trial Counsel FAILED to have the Government Witness Agent
Madeleine Pinckney to Produce Any Tapes or Written Statements Signed
by Williams, in which Williams REPEATLY stated to Trial Counsel that
Agent Pinckney was LIEING on Williams because Williams Could Not and
Would Not Assist Agent Craig Smith, Agent Pinckney, and Others to be
a Informant for the Government & State Authorities on Activities
Williams Knows Nothing about, but Counsel REFUSE to show the Truth
that Agent Pinckney Committed PERJURY Testimony (Exhibit-  G ).

(vii)   Williams was Denied Adequate/Effective Assistance of Trial
Counsel  by Counsel FAILURE to ask Any Questions about the Government's
Witness Joseph Kelton's PERJURY Testimony that Williams participated
in Drug Sales at Danny's Shop and that Williams Supplied him (Joseph
Kelton) with Any type of Drugs for sell (Exhibit-  G ).

(viii)   Williams was Denied Adequate/Effective Assistance of Counsel
in that Trial Counsel FAILED to Produce Exhibits- A,B,C,D,E,F,H, thru N
as Williams Defense Exhibits to show that Government Witness Jonathan
D. Kelton Committed PERJURY Testiomony (T.T.-II-pp.286-294).

(ix)   Williams was Denied Adequate/Effective Assistance of Counsel
in that Trial Counsel FAILED to ask Any Questions of the Government
Witness Agent Craig Smith about the PERJURY Testimony of Government
Witness Agent Madeliene Pinckney about the FALSE Alleged Statements
of Williams that was presented in Court against Williams.(Exhibit- G ).

(x)   Williams was Denied Adequate/Effective Assistance of Counsel
in that Trial Counsel REFUSE to bring to the Attention of the Court
that Government Witness Agent Craig Smith "Directed" the Government
Informant & Key Witness Lucious Bruce Johnson to Bring the Cocaine
that he (Johnson) Purchased to 326 Linwood address on August 11th, 1992
in order to "TRAP" Williams with his (Johnson's) Drugs (T.T.-III-p.19),
but for Trial Counsel's FAILURE to Pursue the TRUTH allowed Agent
Craig Smith (the Government Witness) to Captialize on another Lie
(T.T.-III-pp.70-71)(Exhibit-  G ).

(xi)   Williams was Denied Adequate/Effective Assistance of Counsel
in that Trial Counsel FAILED to Question the Government's Witness
Ronnie Miles whom Testified to PERJURY Testimony that placed Williams
at the scene of a murder (Exhibit-C & G).

(xii)    Williams was Denied Adequate/Effective Assistance of Counsel
in that Trial Counsel FAILED to Cross Examine Williams in a Profess-
ional Manner so that All of the FACTS could have been brought to
the Trial Court's Attention that ALL of the Government Witnessess
that Testified against Williams about Large Amounts of Drugs, Crack
Cociane, Guns and Murders were LIEING and that the Federal and State
Authorities participated in the Perjury by Covering Up the Perjury
Testimony and Committing Perjury Testimony themselves. United States v.
Gribben, 984 F.2d 47 (2nd Cir. 1993), It is not only the public, but
also the prosecutor, magistrate judge, regular grand jury, petit jury,
and district court, that must rely upon the credibility of police
officers.  Whether to prosecute, issue a warrant, indict and convict
are serious matters that are decided in large measure based on what
a police officer relates.  So when an officer does not tell the whole
truth, public confindence in the fair administration of criminal
justice inevitably is eroded.

(xiii)   Williams was Denied Adequate/Effective Assistance of Counsel
in that Trial Counsel FAILED to have the Jury Charged or Request for
a Special Verdict of Any Kind, so that the Jury could have Determine
the Amount of Drugs and What Type of Drugs to Attribute to Williams
in order for the Sentences of Williams for Counts One, Four, Five,
and Six to be within the Guard Rails of the 5th & 6th Constitutional
Amendments.

(xiv)      Williams was Denied Adequate/Effective Assistance of Counsel
in that Appellant Counsel (James R. Beach, Jr.) COMPLETE ABANDON
Williams Double Jeopardy Issue on Appeal for The Elevnth Circuit
Court of Appeals Case No. 94-8325, when it's a Proven Fact that the
Government's Witness Agent Craig Smith Testified that he (Smith) was
the LEAD CASE AGENT starting in 1991,until Williams arrest on August
11th, 1992, and the Trial that exsist at the time (T.T.-III-pp.16, 38-39)
and that he (Smith) "Directed" the Government Informant & Key Witness
Lucious Bruce Johnson to take his (Johnson's) Drugs to Williams at
326 Linwood Road on August 11th, 1992(T.T.-III-p.19), in which Williams
was arrested for and Charged with Possession of Cocaine with Intent
to Distribute/Chatham County Superior Court, Docket No.CR92-26-26,
and on May 12th, 1993 Williams Pled guilty to 10 years (5 years to
serve balance probated)(P.S.I.-p.10-para.-36)(Williams would like
the records to reflect that Williams was Threaten to plea to the
arrest or Williams son's Mother would have been charged), to All of
the Drugs that the Government Informant & Key Witness was Directed
to bring to Williams at 326 Linwood Road on August 11th, 1992, by
the Government Witness Agent Craig Smith (T.T.-III-p.19).

     Williams would like the records to reflect that the State arrest
and conviction for Docket No.CR92-26-26 of the Chatham County Superior
Court was a "SHAM", Created by the Government Witness Agent Craig Smith
(T.T.-III-p.19), in order to get Williams arrested and convicted for
the Federal Charges for Federal Case No.CR493-82, in which the Evidence
from the Chatham County Conviction was used in Williams Federal Trial
and Appellant Counsel (James R. Beach, Jr.) COMPLETELY ABANDON Williams
Double Jeopardy Issue on Appeal by #1. Appellant Counsel FAILED to

show that the Government FAIL to Acknowlege that the "Department of
Justice" has a policy on dual or successive federal prosecutions
spelled out in Section 9-2.142 of the Department of Justice Manual.
Specifically, the Department of Justice policy "precludes the initia-
tion or continuation of a federal prosecution following a state pro-
secution based on substantially the same acts or transaction unless
there is a compelling federal interest supporting the dual or succes-
sive federal prosecution". The policy goes on to state that "in order
to prevent unwarranted dual or successive prosecution, the policy
requires that authorization be obtain from the appropriate Assistant
Attorney General prior to initiating or continuing the federal pro-
secution". According to the Department of Justice Manual, the policy
on dual or prior federal prosecution is intended to reach federal
prosecutions based on substantially the same act or acts that were
involved in a prior state prosecution.

In determing whether the policy against successive prosecution
applies when a state prosecution is for a crime that is slightly
different than the federal case being prosecuted, the Department of
Justice's policy states "even when a perspective prosecution is
technically speaking for an act different from the prior prosecution
or requires proof of different elements subsequent prosecution will not
generally be authorized if, as a practical matter, the two acts were
part of the same transaction and there is no compelling interest
supporting the subsequent federal prosecution".. and under the Depart-
ment of Justice policy statements, failure to comply with the procedures
set forth in the Department of Justice Manual would require, absent
unusual circumstances, dismissal of the charges against Williams even
if that occurred after conviction.

Williams would like the  records to reflect that Williams was previously convicted in the Superior Court of Chatham County, State of Georgia prior to his trial and there was significant federal and state cooperation in the arrest that lead to Williams conviction. Moreover, the conduct for which Williams plead guilty in Superior Court arose out of the same nexus of facts as those offenses charged in the Federal Criminal Indictment in the United States District Court, and the Drugs upon which Williams plead to were  even counted toward Williams Federal Sentece (P.S.I.-p.8-para.-16).

#2. Williams would like the records to reflect that the Chatham County State conviction for the August 11th, 1992 arrest by Agent Craig Smith barred the Government's Use of the Evidence based on Double Jeopardy, a violation of Williams 5th Constitutional Right, because the Supreme Court established the Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180 (1932); analysis for examing double jeopardy issues in cases of dual or successive prosecution.

Blockburger mandates that:

> ...where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offensess or only one is whether each provision requires proof of an additional fact which the other does not.

Blockburger v. United States, 52 S.Ct. at 182.

> A single act may be an offense against two statues; and if each statue requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.

Williams would like the records to reflect that the State and Federal Actions for the Arrest and Prosecution is for the Same Acts. For the Reason set forth in Issue V, The Guilty Verdicts for All Counts of the Indictment should be Vacated or in Alternative an Evidentiary Hearing is Required.....

ISSUE VI

WILLIAMS CONTENDS IN LIGHT OF THE SUPREME COURT'S
RECENT DECISIONS IN APPRENDI v. NEW JERSEY, 530 U.S.
___, 2000 WL 807189 (U.S. JUNE 26, 2000), AND JONES
v. UNITED STATES, 530 U.S.___, 2000 WL 217939 (U.S.
JUNE 29, 2000), WILLIAMS CONVICTIONS & SENTENCES ARE
ILLEGAL AND IN VIOLATION OF WILLIAMS' 5TH & 6TH CON-
STITUTIONAL RIGHTS.

Williams would like the records to reflect that on June 26,2000,

the Supreme Court decided Apprendi v. New Jersey, 530 U.S. __, 2000

WL 807189 (U.S. June 26, 2000), holding that

> [o]ther than the fact of a conviction, any fact
> that increase the penalty for a crime beyond the
> prescribed maximum must be submitted to a jury and
> proved beyond a reasonable doubt..."[I]t is unconst-
> itutional for a legislature to remove from the jury
> the assessment of facts that increase the prescribed
> range of penalties to which a criminal defendant is
> exposed. It is equally clear that such facts must
> be established by proof beyond a reasonable doubt."

Id. at *13 (Emphasis add; citations omitted). Apprendi involved a

state hate-crimes statue, which allowed for an enhanced penalty if

the judge found by a preponderance of the evidence that the defen-

dant acted with a "biased purpose." There was no mention of "biased

purpose" in the Apprendi indictment, however, and the jury made no

findings in that regard. Since, however, the "biased purpose" in-

creased the defendant's sentence above the 10 year maximum for the

offense charged in the indictment, the Court considered it an "element

of the offense." And since it had neither been alleged nor proved

to the jury, the enhanced sentence was unconstitutional, and the

Court vacated it.

Three days later, on June 29, 2000, the Supreme Court in Jones

v. United States, 530 U.S. ___, 2000 WL 217939 (U.S. June 29, 2000)

38

made clear that the rule of Apprendi applies to Drug Cases as well,
by vacating the judgment in a Tenth Circuit crack cocaine case,
and remanding for futher consideration in light of Apprendi.  The
import of the decision in Jones and Williams case is obvious.  The
Tenth Circuit had affirmed a defendant's sentence to two concurrent
terms of 30 years imprisonment for distributing and possessing with
intent to distribute crack cocaine-despite the indictment's specif-
ication of a 20 year maximum penalty.  United States v. Jones, 194
F.3d 1178 (10th Cir. 1999).  According to the Tenth Circuit, section
841(b)(1) was a "sentencing provision independent of the substantive
charges to which it applies."  Id. at 1183 (citations omitted).  And,
in the Tenth Circuit's view, a sentencing judge could "consider
quantities of drugs not charged in the information or indictment or
proven at trial when detemining the applicable mandatory sentencing
directives of §841(b)(1)."  Id. at 1183-1184.

Prior to Apprendi and Jones, the Eleventh Circuit-like the
Tenth-had "clearly rejected the characterization of the amount of
drugs as an element of the offense under [21 U.S.C.]§841."  United
States v. Hester, 199 F.3d 1287, 1291 (11th Cir. January 7, 2000)
(and cases cited therein).  After Apprendi and Jones, however, that
is no longer the law of the Land.  (In Carless Jones, the Solicitor
General "conceded that the ruling which the Court ultimately issued
in Apprendi would invalidate the enhancement imposed by the court
based on drug amount." ).  United States v. Meshack,___, F.3d___, 2000
WL 1218437 at *19 n.16 (5th Cir. August 28, 2000)(Case No.99-50669).

And post-Carless Jones, the government has conceded to the Fifth
Circuit that "the Apprendi decision applies to 21 U.S.C. §841."
Meshack, 2000 WL 1218437 at *11.  In the case of United States v.
Aaron Lamar Rogers, Case No.99-15150, orally argued on August 30,
2000, the government made a similar concession to the Eleventh
Circuit.  Even without the government concessions, every single
lower court to have reconsidered 21 U.S.C. §841 post-Apprendi and
Carless Jones, has concluded that drug quantity is an element of
an aggravated offense (under 21 U.S.C. §841(b)(1)(A) and 841 (b)
(1)(B) which must be alleged in the indictment, proved to the jury
at trial and found by the jury beyond a reasonable doubt, before
the defendant may be subject to the enhanced penalties set forth
in these statues.  These courts have all disavowed longstanding
precedent-identical to Hester-holding that quantity is not an ele-
ment of a §841 offense.  See United States v. Aguayo-Delgado,___,
F.3d ___, 2000 WL 988128 at *5 (8th Cir. July 18, 2000)(Case No.
99-4098)("[after Apprendi, the analysis of the federal drug senten-
cing system [as interpreted in prior circuit decisions] no longer
fully comports with the Supreme Court's jurisprudence concerning
the requirement of proof beyond a reasonable doubt and the scope of
criminal defendants' jury trial right;" proceeding on understanding
that Apprendi limits the statutory sentencing range of 21 U.S.C.
§841(b)(1)(C), i.e., 20 years]); United States v. Sheppard, ___, F.3d
___, 2000 WL 988127 (8th Cir. July 18, 2000)(Case No. 00-1218)(agreeing
that drug type and quantity must be considered elements of separate
§841 offenses); United States v. Meshack,___, F.3d___, 2000 WL 1218437
at *11 (5th Cir. August 28, 2000)(Case No. 99-50669)(broad rule of

constitutional law announced in Apprendi calls into question our prior rule that drug amount is not an element of an §841 case"); United States v. Murphy,___, F.3d___, 2000 WL 1140782 (D.Minn. August 7, 2000)(Case No.4-95-1038DSDFLN)(defendant's 330-month sentence under §841(b)(1)(A) is unlawful); United States v. Henderson,___, F.Supp.2d___, 2000 WL 1006054 at *12 (S.D.W.Va. July 19, 2000)(Case No. Crim. A. 2:99-00214-0)(any increase of a defendant's sentence above the maximum set forth in 21 U.S.C. §841(b)(1)(C), requires that the government "allege the drug amount in the indictment, submit that fact to the jury, and prove the existence of the fact beyond a reasonable doubt."). To the extent that any factor-drug amount, for instance -increase the defendant's sentence above the statutory maximum,it must be alleged in the indictment, and proved beyond a reasonable doubt to the jury. If it is not, a defendant's sentence above the statutory maximum is unconstitutional. See also Jones v. United States, 526 U.S. 227, 243 n.6 (1999)("under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt[). Applying these principles, Williams sentences to Life imprisonment, and 10years of supervised release, to Counts One and Five of the convictions, is clearly Unconstitutional.

Williams indictment charged him with one count of conspiracy to possess with intent to distribute and to distribute cocaine and

cocaine base, schedule II narcotic controlled substances, in viol-
ation of 18 U.S.C. §2, & 21 U.S.C. §§841(a)(1) & 846 (Count I);
knowingly used and carried a firearm during and in relation to a
drug trafficking crime, in violation of 18 U.S.C. §924 (c) (CountIV & VI);
did knowingly and intentionally possess with intent to distribute
cocaine and cocaine base , schedule II narcotic controlled substance,
in violation of 18 U.S.C. §2, & 21 U.S.C. §841(a)(1)(Count V); and
possession of a firearm by a convicted felon, in violation of 18 U.S.C.
§§922(g) and 924(A)(2)(Count VII).

The indictment DID NOT specify a particular amount of cocaine
or cocaine base-only "a schedule II narcotic controlled substances."
And in contrast to Carless Jones, it DID NOT even mention §841(b)(1)
(which specify the penalties for violation of §841(a)(1)). Moreover,
the jury made no findings in Williams case, as  to the amount of
cocaine or cocaine base Williams possessed or conspired to possess.

Without any specification of amount in the indictment, and
without any jury findings in that regard, the enhanced penalty provision
of §841(b)(1)(A)(A mandatory Life for possessing wiht intent to dis-
tribute 50 grams or more of a mixture or substance described in clause
(ii) which contains cocaine base and a Mandatory 10 year term of
supervised release, if the defendant has two prior convictions for
a felony drug offense), are applied in violation of the Fifth Amend-
ment presentment clause and due process clause, as well as the Sixth
Amendment notice and jury trial guarantees. As it currently stands,
therefore Williams sentences for Counts One and Five are Illegal.

The only "sentencing" provision which MIGHT constitutionally be applied in an "unspecified amount" case such as Williams is 21 U.S.C. §841(b)(1)(C) provides a 20 year statutory maximum penalty[2]. Under that provision, there is no statutory maximum term supervised release but there is at least a 3 year term of supoervised release. Accordingly, the Court should vacated Williams Life sentence" and resentence him according to the U.S.S.G. §2D1.1, Base Offense Level of 12, Criminal History Catergory III, a sentence of 15-21 months imprisonment, to be followed by 3 years of supervised release on Counts One and Five[3].

---

[2]. It is arguable that even the "fact of a prior conviction" must be alleged in the indictment and proved to the jury at trial, to form the basis for an enhanced sentence in a drug case. Although the Supreme Court excluded from its rule in Apprendi, "the fact of a prior conviction, "2000 WL 807189 at *13, it carefully explained that require proof beyond a reasonable doubt was that its decision in Almendarez-Torres v. United States,___ , U.S. ___, 118 S.Ct. 1219 (1998) was not being contested and that it need not revisit that issue in order to resolve the dispute in question in Apprendi. See 2000 WL 807189 at *13.

The Supreme Court acknowledged, however, that "it is arguable that Almendarez-Torres was incorrectly decided, and that a logical application of our reasoning today should apply if the recidivist issue were contested." Apprendi, 2000 WL 807189 at *13 see also Id. at *29(emphasis added). The Supreme Court went on to note that any revisiting of Almendarez-Torres would require an application of the "pleading requirement" which was ignored by the Court in Almendarez-Torres. See Apprendi, 2000 WL 807189 at *13, n.15. Under the pleading requirement, "the indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted." Id.(quoting United States v. Reese, 92 U.S. 214, 232-233, L.Fd. 563 (1875)(Clifford, J., concurring)).

In his concurring opinion, Justice Thomas all but conceded that his decision to join in the 5-4 majority in Almendarez-Torres was a mistake, noting that the impending consequences of Apprendi, 2000 WL 807189 at *29(Thomas J., concurring). After an exhaustive review of 200 years of precedent, the concurrence concluded that the majority decision in Apprendi, "far from being a sharp break with the past, marks noting more than a return to the status quo ante-the status quo that reflected the original meaning of the Fifth and Sixth Amendments." Id. at *28. It is expected that the Supreme Court, next term, will limit Almendarez-Torres to its facts, and that other enhancements (such as that pursuant to 21 U.S.C. §851) will be subject to the general rule of Apprendi. That, truly, is the proper, constitutional way in looking at this case.

Here, the interests of justice require that Williams be allowed to take advantage of these two recent Supreme Court decisions which-when read in tandem-change controlling law in this circuit, and show that Williams enhanced sentences were imposed in violation of the Constitution, and without proper jurisdiction in the district court. Indeed, in the same way that the district court in Harris v. United States, 149 F.3d 1304 (11th Cir. 1998), lacked jurisdiction to en-hance a sentence unless the government strictly complied with the procedural requirements of §851(A), the district court here lacked jurisdiction to enhance Williams sentence without the necessary allegations as to amount in the indictment and proof of the amount beyond a reasonable doubt at trial. Jurisdictional defects are non-waivable and non-defaultable. They are properly remedied-indeed, they MUST be remedied-upon §2255 review. See Harris, Id. at 1308 (court does not have jurisdiction to impose enhanced sentence, simply because defendant failed to object to the enhancement on jurisdictional grounds at trial or on appeal; granting defendant reief under §2255).

---

3.  The Probation Officer used the 1996 Edition of the U.S.S.G. Manual which states "Ch. 1 pt. A- INTRODUCTION 1. Authority: The United States sentencing Commission ("Commission") is an independent agency in the judicial branch composed of seven voting and two non-voting, ex officio members.  Its principal purpose is to establish sentencing policies and practices for the federal criminal justice system that will assure the ends of justice by promulgating detailed gujdelines prescribing the appropriate senteces for offenders convicted of fed-eral crimes.

The guidelines and policy statements promulgated by the Commission are issued pursuant to Section 944(a) of Title 28, United States Code.

Williams would like the records to reflect that by looking at Apprendi, 2000 WL 807189, the Trial Court was in Error of Attributing a (4) Four Level Enhancement in behalf of U.S.S.G. §3B1.1(a) by making Williams "an Organizer or Leader of a Conspiracy which involved five or more participants," when in Fact the Indictment DID NOT allege said Conduct Proved to the Jury, the Enhanced Sentence is Unconstitutional.[4]

Williams would like the records to reflect that Williams maintain that the Drug Amount is Indeed an Element of Every 21 U.S.C. §841 offense and by the government's FAILURE to have the Grand Jury to Specify the Drug Amount (which is an element) that Williams should be Indicted and Held Accountable for is a Complete Violation of Williams 5th & 6th Constitutional Rights and the Indictment for Case No. CR493-82 is Completely Unconstitutional and Counts One, Four, Five, and Six should therefore be Vacated. United States v. Steele, 117 F.3d 1231 (11th Cir. 1997), Each essential element of offense must be alleged in indictment.
United States v. Cochran, 17 F.3d 56 (3rd Cir. 1994), Indictment that fails to charge all essential elements of crime must be dismissed.

For the Reasons set forth in Issue VI, based on the recent decisions in Apprendi & Carless Jones, Williams Convictions & Sentences are Illegal and a Violation of Williams 5th & 6th Constitutional Rights.

---

4. Apprendi, 2000 WL 807189, states: [o]ther than the fact of a conviction, any fact that increases the penalty for a crime beyond the prescribed maximum must be submitted to a jury, and proved beyond a reasonable doubt..."[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt."

## CONCLUSION

1). The Government Committed Complete Prosecutorial Misconduct in behalf of Case No. CR493-82. A violation of Williams 5th & 6th Constitutional Rights.

2). The District Court Judge Abused Discretion in behalf of Case No. CR493-82. A violation of Williams 5th & 6th Constitutional Rights.

3). The District Court Judge Erred by Not Supplying the Definitions of the "Use and Carrying" Prong in the Jury Instructions. A violation of Williams 5th & 6th Constitutional Rights.

4). The Presentence Investigation Report in behalf of Williams is In-Correct in violation of Fed.R.Crim.P.32. A violation of Williams 5th Constitutional Right.

5). Williams was Denied Adequate/Effective Assistance of Trial & Appellant Counsel. A violation of Williams 6th Constitutional Right.

6). In light of the Supreme Court's recent decisions in Apprendi v. New Jersey, 530 U.S.___, 2000 WL 807189 & Jones v. united States, 530 U.S.___, 2000 WL 217939, Williams Convictions & Sentences are Illegal, Unconstitutional and in violation of Williams 5th & 6th Constitutional Rights.

WHEREFORE, Williams contends that he was Denied his 5th & 6th Constitutional Rights during Pre-Trial, Trial, Sentencing, and Direct Appeals.  Accordingly, Williams moves the Honorable Court to Vacate, Set Aside, or Correct his Convictions and Sentences pursuant to Title 28 U.S.C. §2255, or Grant Williams an Evidentiary Hearing, and Any Other Relief this Court Deems Necessary.

Respectfully submitted,

James Clifford Williams (Pro se)
#08355-021
Federal Correctional Institution
P.O. Box 7007
Marianna, Florida   32447-7007

I declare under penalty of perjury that the foregoing is true and correct.  Executed on _2oth of October_, 2000, by James Clifford Williams, who has produced his Inmate I.D. as identification and who did take an oath.

_10/20/00_
Date

**STERLING DARNELL DAWSON**
Notary Public, State of Florida
My comm. expires July 25, 2003
Comm. No. CC857753

47

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a True and Correct copy along with (3)
Three more copies of the foregiong was served pre-paid first class
postage by The United States Postal Service, this _20th_ day of
_October_____, 2000 to the below listed:

Clerk of Court
United States District Court
Southern District of Georgia
    Savannah Division
P.O. Box 8286
Savannah, Georgia  31412-8286

Respectfully submitted;

_James C. Williams_

James Clifford Williams (Pro se)
#08355-021
Federal Correctional Institution
P.O. Box 7007
Marianna, Florida 32447-7007

48

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | | | Page 1 of 2 |
|---|---|---|---|---|
| 1. PROGRAM CODE<br>N/A | 2. CROSS FILE | RELATED FILES | 3. FILE NO.<br>G9-91-0012 | 4. G-DEP IDENTIFIER<br>KA2-C1 |

| 5. BY S/A Craig Smith<br>AT Savannah RO | 6. FILE TITLE<br>HARRINGTON, Matthew |
|---|---|
| 7. ☐ Closed ☐ Requested Action Completed<br>☐ Action Requested By | 8. DATE PREPARED<br>October 7, 1991 |

9. OTHER OFFICERS
TFO Warren Washington, DEA Savannah RO

10. REPORT RE
Interview of Al GOLDWIRE on October 4, 1991

DETAILS

1. On October 4, 1991, S/A Craig Smith and TFO Warren Washington interviewed Al GOLDWIRE are the Laurens Detention Center in Dublin, GA. The interview started at approximately 12:45 pm. Al GOLDWIRE related the following information.

2. Al GOLDWIRE stated that he had met Matthew HARRINGTON and Johnny HARRINGTON in 1982 or 1983. Between the months of June through August of 1989, GOLDWIRE stated that Matthew HARRINGTON purchased one quarter kilogram of crack cocaine every week from Byron THOMPSON at THOMPSON's mother's residence located at 307 Duffy Street, Savannah, GA. GOLDWIRE stated that Matthew HARRINGTON drove a gold BMW and paid $5,500.00 per quarter kilogram of crack cocaine.

3. GOLDWIRE stated that after he was arrested and was released on bond concerning the Byron THOMPSON case, GOLDWIRE met with Matthew HARRINGTON. Because GOLDWIRE did not have any money, he met with Matthew HARRINGTON who fronted GOLDWIRE $500.00 worth of cocaine. During this transaction, Matthew HARRINGTON drove a 2 door Oldsmobile 88, brown and cream in color. During this first transaction, Matthew HARRINGTON told Randy KNOX to give GOLDWIRE the crack cocaine and that GOLDWIRE was to pay KNOX only $200.00. During the entire time that GOLDWIRE was on bond, up until December 1989, GOLDWIRE purchased a half ounce of crack cocaine for $600.00 on five different occasions.

4. During the month of September 1989, GOLDWIRE met Johnny HARRINGTON at his residence located in Hamstead Apartments. During this time, HARRINGTON was driving a blue Cutlass. While at the residence, Johnny HARRINGTON gave GOLDWIRE some marijuana to smoke so he could relax. GOLDWIRE recalled that during one of the half ounce buys from Matthew HARRINGTON, Johnny HARRINGTON was also present at the Hamstead Apartment.

5. GOLDWIRE stated that his wife his wife, Lizzette PRAYLO, (further described below) works as a nurse assistant at Memorial Medical Center.

| 11. DISTRIBUTION. | | 12. SIGNATURE (Agent)<br>S/A Craig Smith | 13. DATE<br>10-16-91 |
|---|---|---|---|
| REGION | | | |
| DISTRICT | Atlanta | 14. APPROVED (Name and Title)<br>RAC DOUGLAS L. DRIVER | 15. DATE<br>10-18-91 |
| OTHER | AMRI, OC, DIG<br>10/11 st | | |

DEA Form 6
(May 1980)

DEA SENSITIVE
DRUG ENFORCEMENT ADMINISTRATION
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.
Previous edition may be used

DATE: _____ THIS REPORT IS SUBMITTED TO
DEFENSE COUNSEL _____ PURSUANT TO
THE PROVISIONS OF TITLE 18 U.S.C. 3500 BY AUSA
RECEIVED BY. _____

Exhibit-(A)

| stated **REPORT OF INVESTIGATION** *(Continuation)* | 1. FILE NO. | 2. G-DEP IDENTIFIER |
|---|---|---|
| | 3. FILE TITLE ...0012 | KA2-C1 |

| 4. Page of | HARRINGTON, Matthew |
|---|---|

| 5. PROGRAM CODE 2 2 | 6. DATE PREPARED |
|---|---|
| N/A | October 7, 1991 |

6. GOLDWIRE stated that Roscoe BACON purchased a quarter kilogram of crack cocaine from Byron THOMPSON at least every week. GOLDWIRE stated that sometimes BACON would purchase a quarter key twice a week. GOLDWIRE stated that BACON was driving a 1985 or 1986 beige Fleetwood Cadillac which was sold to him by Byron THOMPSON. On one occasion, Byron THOMPSON sold BACON a half a kilogram of crack cocaine for about $11,000.00. Most of these purchases occurred at 307 Duffy Street, Savannah, GA.

7. Also during the months between June through August 1989, Michael JOHNSON ████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**INDEXING SECTION**

1. HARRINGTON Matthew, NADDIS pending

2. HARRINGTON, Johnny, NADDIS 1622254

3. ████████████████████

4. KNOX, Randy, NADDIS pending

5. PRAYLO, Lizzette, NADDIS NR, Black Female, Height: 5'4", Weight: 140-150 lbs, Medium Complexion, DOB: 7/25/69, Drives: blue 1979 Cadillac with a rag top, Resides: 2203 Tennessee Ave, Savannah, GA

6. BACON, Roscoe, NADDIS 2747488

7. JOHNSON, Michael, NADDIS 2554141

8. ████████████████████

DATE:_____THIS REPORT IS SUBMITTED TO DEFENSE COUNSEL_____PURSUANT TO THE PROVISIONS OF TITLE 18 U.S.C. 3500 BY AUSA _____ RECEIVED BY _____

DEA Form — 6a
(May 1980)          10/11 st
**DEA SENSITIVE**
**DRUG ENFORCEMENT ADMINISTRATION**
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency to which loaned.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | | | Page 1 of | 2 |
|---|---|---|---|---|---|

| 1. PROGRAM CODE N/A | | 2. CROSS FILE | RELATED FILES | 3. FILE NO. G9-91-0012 | 4. G-DEP IDENTIFIER KA2-C1 |
|---|---|---|---|---|---|
| 5. BY AT | S/A Craig P. Smith Savannah, GA | ☐ ☐ ☐ ☐ ☐ | | 6. FILE TITLE HARRINGTON, Matthew | |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By | | | | 8. DATE PREPARED October 10, 1991 | |
| 9. OTHER OFFICERS | | | | | |
| 10. REPORT RE: | Interview of Al GOLDWIRE | | | | |

DETAILS:

1. On October 8, 1991, S/A Craig P. Smith met with Al GOLDWIRE at the office of the United States Marshal, Savannah, GA. S/A Smith showed GOLDWIRE four photographs which he had received from Det. Ron Hood of the Fort Lauderdale, FL, Police Department concerning a surveillance performed in Fort Lauderdale on February 16, 1991. GOLDWIRE stated that the black female in the photograph appeared to be his wife, Lizzette PRAYLO, but GOLDWIRE said that he was not completely sure because the picture was not very clear. GOLDWIRE stated that his wife did wear her hair in this manner and that, from the backside, it appeared to be the shape of his wife. GOLDWIRE stated that his wife's name was Lizzette PRAYLO. GOLDWIRE stated that the address shown on the surveillance report of 8507 Vining Way, Savannah, GA, was his wife's mother's house. According to the surveillance report written by Det. Ron Hood, Lizzette PRAYLO checked in at the Oakland East Motor Lodge, 3001 North Federal Highway, Fort Lauderdale, FL, and was registered in room 210. The registration card indicated that the time of check-in was 0811 hours, 2/16/91.

2. GOLDWIRE stated that Lizzette PRAYLO's parents' number was 912-927-0516. According to the surveillance report written by Det. Ron Hood, Hood received the following information indicating that the following calls were made from room 210, February 16 through February 17, 1991. On February 16, 1991, two calls were placed to the telephone number 912-927-0516 running a total of fourteen minutes. Also on the surveillance report was subscriber information to the following number: 912-232-5916 which came back to Sheila ROBINSON at 803 East 31st Street, Savannah, GA. GOLDWIRE stated that Sheila ROBINSON was the aunt of Lizzette PRAYLO. GOLDWIRE also stated that the house located at 2203 Tennessee Avenue in Savannah, GA, is in the name of Sheila ROBINSON.

INDEXING SECTION:

1. GOLDWIRE, Al, NADDIS 2371708.

| 11. DISTRIBUTION: | | 12. SIGNATURE (Agent) Craig P. Smith, S/A | 13. DATE 10-16-91 |
|---|---|---|---|
| REGION | Atlanta | | |
| DISTRICT | | 14. APPROVED (Name and Title) Douglas L. Driver, RAC | 15 DATE 10-18-91 |
| OTHER | AMRI,OC, DIG 10/16/91 d1 | | |

DEA Form - 6
(May 1980)

**DEA SENSITIVE**
DRUG ENFORCEMENT ADMINISTRATION
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned
Previous edition may be used

| REPORT OF INVESTIGATION<br>*(Continuation)* | 1. FILE NO.<br>G9-91-0012 | 2 G DEP IDENTIFIER<br>KA2-C1 |
|---|---|---|
| **4.** Page  2  of  2 | 3. FILE TITLE<br>HARRINGTON, Matthew | |
| **5. PROGRAM CODE**<br>N/A | **6. DATE PREPARED**<br>October 10, 1991 | |

2.  PRAYLO, Lizzette, NADDIS negative.

3.  ROBINSON, Sheila, NADDIS negative.





DEA Form – 6a   10/16/91 dl   **DEA SENSITIVE**
(1980)   **DRUG ENFORCEMENT ADMINISTRATION**
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency to which loaned.

Previous edition may be used.

METRO DRUG SQUAD
REPORT OF INVESTIGATION
CRN:

Page  1 of 4 Page[s]
------------------------------------------------------------
BY:     Sgt. J. I. Pennington        Det. B. L. Smalls
                                     Det. V. R. Gordon
DATE:   August 7, 1992
------------------------------------------------------------
REPORT REFERENCE
NAME:            DEBRIEFING OF CI #SG9-92-X022
ADDRESS:
------------------------------------------------------------


On Friday, August 7, 1992 at approximately 2:30 P.M., this investigator along with Detectives Smalls and Gordon debriefed CI #SG9-92-X022 in reference to his/her knowledge concerning two homicides that occurred in Savannah, Chatham County, Georgia.

FIRST HOMICIDE:

CI stated that approximately four to five years ago that he/she had helped to dump a body of a black male, name unknown. These are the circumstances that led up to this as related by the CI:

GODFREY, a supplier of cocaine from New York, had come to Savannah looking for Carl DOUGLAS aka Karl ESCOFFERY aka "B" to distribute cocaine in this area for him a few months prior to this murder.  GODFREY could not find "B" and this black male was said to have told GODFREY he could do it for him.  GODFREY left a 1985 Toyota Cressida, gray in color, and the cocaine with this black male.  After a period of time, GODFREY contacted "B" by telephone to see if he had any contact with the black male.  "B" told GODFREY to come on down to Savannah, and they would find this black male. GODFREY wanted his car and his money for the cocaine.

In mid-afternoon, after GODFREY'S arrival, James WILLIAMS aka Swinger, Carl DOUGLAS aka "B", GODFREY, Marty LNU [works for GODFREY], Ronnie MILES, Charles WILLIAMS aka Slick, the CI rode to Ft. Stewart and found the black male.  The black male was forced into the car [K-Car Dodge/Alliance, white four door with tan interior, rented by the CI from Agency Rental Car, Montgomery Cross Roads] and brought back to Savannah.

They went to an upstairs apartment on Barnard Street near Nephew Street.  This apartment was rented by an illegal Jamaican. The black male was beaten and tortured in the CI's presence.


/jm 08/12/92                    (Exhibit-B)

                                          Sgt. J.I. Pennington
REPORTING OFFICER:  Sgt J.I. Pennington

APPROVED BY:

METRO DRUG SQUAD
REPORT OF INVESTIGATION
CRN:

Page 2  of 4  Page[s]

--------------------------------------------------------------

REPORT REFERENCE:   DEBRIEFING OF CI #SG9-92-X022

--------------------------------------------------------------


The CI left the apartment to obtain clothing from his/her residence on Bonaventure Road. He/she was to drive GODFREY back to New York. When the CI returned, the black male had been shot. The black male had been wrapped in a blanket/bedspread. The CI observed bullet holes in the tub and bathroom area. WILLIAMS and DOUGLAS told him/her that he/she had to go dump the body. The body was wrapped in a burgundy bedspread [suede-like] and tied with telephone cord on both ends and an extension cord in the middle. WILLIAMS and the CI went to the last street in Tatumville [Tatum & Ewell Streets] where they dumped the body in the wooded area. The CI believed that the body was found one or two months later.

They went back to the apartment, all the belongings were packed up and the CI left driving the Toyota Cressida with GODFREY back to New York.

The black male was described as being approximately 5' 11" tall, 140 pounds, poor looking [like having a crack habit], bad hygiene, curly hair, fair skin. The only clothing he would have on were blue bikinis.


SECOND HOMICIDE:

This homicide was to have occurred in the early part of last year at Danny's Auto Body Shop, located on Staley Avenue across from the Cash & Carry. Persons involved were Danny KELTON, James WILLIAMS aka Swinger, and CI #SG9-92-X022. The person murdered was KELTON'S partner, SPIVEY.

Around 5:00 or 6:00 P.M., the mechanic at the shop [Frank LNU] was sent home. WILLIAMS and KELTON were in the paint shop talking with SPIVEY. WILLIAMS came into the trailer where the CI was sitting. WILLIAMS told the CI to lock the back gate. As the CI was returning through the trailer, he/she heard a pop and knew someone had been shot. The CI continued through the trailer into the shop area. KELTON was walking out of the paint stall removing


/jm 08/12/92

--------------------------------------------------------------

· Sgt. J.I. Pennington

REPORTING OFFICER: ___Sgt J.I. Pennington___

APPROVED BY:

METRO DRUG SQUAD
REPORT OF INVESTIGATION
CRN:

                              Page 3  of 4  Page[s]
-----------------------------------------------------------

REPORT REFERENCE:    DEBRIEFING OF CI #SG9-92-X022

-----------------------------------------------------------


a pair of gloves and saying "I told him not to f--- with me"
repeatedly.  **KELTON** gave the gun [possibly a .38] to **WILLIAMS**.
**WILLIAMS** busted the gun up, putting parts in the sewer in front of
the body shop.  The remaining parts were thrown along I-16.  The
CI observed **SPIVEY** face down on the floor, lying on plastic used
for paint drippings.  **SPIVEY** had been shot in the head.  **WILLIAMS**
rolled **SPIVEY** over onto a blue tarp and told the CI to get the red
Volvo Station Wagon and back it up to put the body in.

    **KELTON** drove **SPIVEY'S** truck to the airport and checked it into
the long-term parking area.  **KELTON** then got into a red truck [a
Sierra with tinted windows that also belonged to **SPIVEY**] with
**WILLIAMS** and the CI was following them driving the Volvo Station
Wagon.  They drove around for awhile trying to locate a place to
dump **SPIVEY'S** body.  **WILLIAMS** finally went to an old shack in
Bloomingdale [believed to be **WILLIAMS'** relatives land] and stopped.
**WILLIAMS** and **KELTON** removed the body from the Volvo, the CI acted
as though helping and it was dragged to the location where it was
left.  **WILLIAMS** sent the CI to K-Mart to purchase white rocks and
soil.  When the CI returned, they just covered the body with the
soil and  left.

    **SPIVEY** was described as a white male, wearing brown shoes,
light colored shirt, khaki pants or jeans.  A gold chain and Dial
Page beeper were left, but his wallet was taken.

    The Volvo Station Wagon belonged to a customer of the paint
shop.  The CI stated that blood was in the wheel well and he/she
did attempt to clean it up.  The CI further related that a white
female with blonde hair was the owner and worked at SCAD he thought
because he/she had seen it there.  The vehicle displayed Iowa State
license plants.

    **Jonathan Danny KELTON** was described as a white male, 28-29,
6-2[3], 190, dark brown hair.  **KELTON** had gotten married just
recently and is believed to live in a condo on Wilmington Island.


/jm 08/12/92


-----------------------------------------------------------
                                  Sgt. J. I. Pennington
REPORTING OFFICER: _Sgt J.I.Pennington_____

APPROVED BY:    _____   _____   _____ ____

91020072

INVESTIGATIVE SUMMARY

08/10/92

    Reporting officer informed by telephone this a.m. by Capt.
Tom Tracy of the Chatham County Metro Drug Squad that their major
case squad had developed an informant that was apparently present
at the murder of Rickey Spivey.  Tracy further advised that the
informant had been working with them for about six weeks, and was
currently involved in a drug case of significant importance.   A
meeting was scheduled for 2:00 p.m. at the MDS office.
    Reporting officer attended the meeting at 2:00 p.m. that the
CI was currently enroute to New York to purchase cocaine in a
controlled buy managed by the MDS major case squad and DEA,
involving a defendant: James Williams aka "Swinger".   Present at
the meeting were reporting officer, Chief Dennis Simmons (Millen
Police Dept.), as well as Sgt. Irene Pennington, Rick Daley, Vic
Gordon, Bernie Smalls, and Frank Polk of the MDS major case
squad.   Representatives from DEA were also present, to include
RAC Doug Driver and others.   Det. Stover was also present from
SPD in reference to a second homicide which the CI had knowledge
of.   Sgt. Pennington stated that the CI had informed them of the
following: on the date of Spivey's murder, he was present at
Danny's Auto Body on Staley Ave, along with Spivey, Danny Kelton,
and James Williams ("Swinger").   The CI was told by Kelton and/or
Williams to go outside and lock the gate.   Upon doing so, he
heard a "pop", and when he began to reenter the building, he was
met by James Williams leaving the building, followed by Danny
Kelton.   Kelton was removing a pair of gloves, and saying: "I
told him not to fuck with me, I told him not to fuck with me".
Upon reentering the building, the CI found Spivey dead from an
apparent gunshot wound to the back of his head.   The CI further
stated that Spivey's body was wrapped in plastic, and a blue
cover, and then loaded into the back of a red Volvo Station
wagon.   The Volvo belonged to a white woman who worked at the
Savannah College of Art and Design, and had Iowa license plates.
The woman was also very irritated when she was later delayed in
picking up her car because the requested repairs had not been
performed on time.   They then left Danny's Auto Body with the CI
driving the red Volvo (containing Spivey's body), Kelton driving
Spivey's work truck (a gray Nissan owned by Port City Bumper),
and Williams driving Spivey's personal truck, a red Silverado
pickup.   They then drove far up into Effingham county, and even-
tually into Bloomingdale to a shack which was owned by relatives
of Williams.   They then dumped Spivey's body into the ditch
adjacent to the shack.   The CI was then made to go to another
location and retrieve white landscaping rocks and potting soil to
cover Spivey's body.   The CI returned to the location and the
white rocks and soil were dumped on Spivey's body.   Spivey's work
truck was then driven by Kelton to long term parking at Savannah
International Airport where it was left.   They then returned to
Danny's Auto Body where the CI was told to clean out Spivey's
blood from the wheel wells of the Volvo, but he failed to do so.

91020072

The CI stated that Spivey was wearing brown deck shoes, khaki pants, and a sweater type shirt.

Reporting officer, Chief Simmons, and agents Vic Gordon, Bernie Smalls, and Frank Polk then went to the Savannah College of Art and Design, where we met with Derek LaMarch who allowed us to review the SCAD vehicle records. We located a record on a red 1982 Volvo station with Iowa license plates belonging to a Julie Lea Lansaw of 513 Whitaker St., Savannah (attached as a part of this file). I attempted to call Ms. Lansaw (912 234-1834) and succeeded in leaving a message for her to page me on her answering machine. I was then paged by Ms. Lansaw at around 5:00 p.m.

We then went to Ms. Lansaw's residence, where we observed a red 1982 Volvo station wagon with Iowa plates, which she stated that she owned. When asked if she had ever taken the car to Danny's Auto Body for repairs, she stated that she had. She had left the car at Danny's from around Thanksgiving 1990 until early January 1991 for repairs from a hit and run. She had taken the car their a second time in March or April 1991 for a brake job. Ms. Lansaw then drove the Volvo to the Chatham County barracks where it was secured in their lot. Ms. Lansaw then gave a voluntary statement to myself, Det. Stover, Agent Daley, and assistant District Attorney Greg Jacobs. Ms. Lansaw reiterated her prior statements in reference to the time period in which her car was at Danny's Auto Body. Upon questioning, she further stated that when she picked her car up, it seemed to her to be low on gas. In addition, the trip odometer had been reset to zero, although the car was in a different location than where she had parked it when she delivered it. Ms. Lansaw also described the location of Danny's Auto Body (accurately), and also stated that, upon the first delivery, she had surrendered the car to someone who introduced himself as Danny. She further stated that she could identify him if she saw him again.

Vic Burke

91020072

INVESTIGATIVE SUMMARY

03/12/92

Reporting officer received this date from Agent Frank Polk a
copy of his report regarding the procurement of the red Volvo
station wagon on 08/10/92.  Said report has been made a permanent
part of this file.

Reporting officer met with CI at Bloomingdale Police Depart-
ment this evening at about 7:30 p.m.  Also present were Agents
Vic Gordon, Bernard Smalls, and Frank Polk of the Metro Drug
Squad.  CI first agreed to transport us to the site where he,
Danny Kelton, and James Williams left the body of Ricky Spivey.
As we exited the P.D. parking lot onto Highway 80, the CI in-
formed us to take him to Interstate 16 and he could find his way
to the site from that reference point.  We traveled South on Ga.
17 towards I-16.  As we crossed the railroad tracks just South of
Boulevard Street, the CI told the driver (Frank Polk) to turn
around.  The CI then instructed Polk to turn right off of Ga. 17
onto Boulevard.  Upon approaching the intersection of Boulevard
and Pine St., the CI instructed Polk to turn right onto Pine.  As
we approached the end of Pine St., the CI instructed Polk to turn
right into the driveway of the abandoned house at the end of
Pine.  The CI then correctly pointed out the location where
Spivey's body had been laying.  He also correctly noted that
Spivey was laying with his head toward the East, and his feet
toward the West, in the ditch adjacent to the property.  He also
correctly stated that Spivey was wearing brown loafer type shoes
with laces, brown khaki pants, and a gold chain.

After the CI pointed out the location correctly, we then
returned to the Bloomingdale Police Department, where he agreed
to give a voluntary tape recorded statement.  The CI essentially
stated the following: On the date of Spivey's disappearance, he
was at Danny's Auto Body Shop on Staley avenue from around 8:00
a.m. until about 11:00 p.m. that evening.  During the early
afternoon, Spivey came to the shop, and he and Kelton went into
the office.  They were apparently arguing over money, as they
usually did when Spivey came to the shop.  Spivey left and then
returned to the shop at some time between 5:30 p.m. and 6:00 p.m.
James Williams then told the mechanic working, Frank, to take the
rest of the day off.  Williams then instructed the CI to go and
close the gate outside.  The CI complied and then came back into
the shop.  Williams again told the CI to go outside and close the
gate, at which time the CI replied that he had just done so, and
asked what was going on.  Williams told the CI that Kelton was
tired of Spivey and was going to "do" him.  CI again left the
area of the shop as though he were going to lock the back gate.
He returned to the shop shortly, and heard a pop as he approached
the building.  As he reentered the shop, Williams was exiting the
shop.  He was followed by Kelton, who was removing a brown pair
of gloves, and saying: "I told him not to fuck with me, I told
him not to fuck with me."  Upon entering the shop, the CI ob-
served Spivey's body laying face down, and apparently had been
shot in the back of the head.  The CI was then instructed by

91020072

Williams to pull the Volvo station wagon into the shop. Spivey's
body was then wrapped in plastic it was laying on, and then again
wrapped in a blue boat cover which had been formerly used to
cover a boat belonging to Spivey, and loaded into the rear of the
Volvo. Kelton then washed the shop down to dispose of the blood,
and Williams smashed the gun into pieces. The gun appeared to be
a black colored snub nosed revolver with brown grips. They then
left the shop with the CI driving the Volvo, Kelton driving
Spivey's gray Nissan work truck, and Williams driving a red
Chevrolet Silverado pickup which belonged to Spivey. They drove
to I-516, and then west on I-16 into Effingham county where they
eventually took an exit and entered onto a dirt road. The CI
stated that he became afraid that they would kill him, so he
failed to follow the other vehicles down the secluded road. When
they returned to check on him, he stated that this was a bad
location. Williams then stated that they could take the body to
a house in Bloomingdale owned by his cousin, Stacy from Albany,
NY. They then took the body to the location at the end of Pine
St. The body was unloaded and dumped out of the boat cover into
the ditch, with Spivey's head facing east and his feet facing
west. The boat cover was then folded and returned to the Volvo.
The three then attempted to cover Spivey's body with rocks from
the railroad bed, and dirt. When this was unsuccessful, the CI
was instructed to go and buy landscaping rocks and potting soil
with which to cover Spivey's body. The CI was given cash by Wil-
liams (which he had been given by Spivey) in order to purchase
these materials. The CI went to K-Mart on Victory drive in
Savannah and purchased these materials, and then returned to Pine
St. in Bloomingdale where Williams and Kelton were still waiting.
They covered the body with the white landscaping rocks and pot-
ting soil, and then left the area. They then drove to Savannah
International Airport, where the gray Nissan was checked into
long term parking by Kelton. They then returned to Danny's Auto
Body shop. The CI was instructed to take the Volvo home and
clean out the blood. The CI stated that he took the Volvo home,
and then kept it for some few days after. He further stated that
he was instructed to go back to the Pine St. location by Kelton,
and recover the body with rocks and soil. The CI stated that he
did this on the day following the murder. He was instructed to
do so again by Kelton, but failed to do so, choosing instead to
lie to Kelton and state that he had.

                                        Victor Burke

**U.S. Department of Justice**
Drug Enforcement Administration

| | 1. FILE NO. G9-93-Z001 | 2. G-DEP IDENTIFIER INC-31 |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | 3. FILE TITLE Harrington, Matthew | |

| 4. Page 4 of 6 | |
|---|---|
| 5. PROGRAM CODE | 6. DATE PREPARED Sept. 29, 1993 |

cocaine connection in New York and MILES was left to maintain the apartment for three days while ESCOFFERY, WILLIAMS and Lucious made a trip to New York. MILES recalls that it was during this time that ESCOFFERY and WILLIAMS began to use Lucious to frequently rent cars and "mule" cocaine to Savannah for them.

11. ESCOFFERY, WILLIAMS and Lucious returned from New York with 4-5 ounces of powder cocaine which ESCOFFERY later converted to crack which was disbursed among MILES, WILLIAMS and Charles WILLIAMS. Marty, Godfrey and another Jamaican, FNU LNU arrived in another vehicle. This was the first time MILES met Marty, Godfrey, and FNU LNU. MILES advised that MILES, ESCOFFERY, WILLIAMS, Lucious, Godfrey, Marty and FNU remained in the Clifford Street apartment engaged in casual conversation for roughly one hour, after which everyone except MILES and Marty left for approximately two hours.

12. After an approximate two hour absence, ESCOFFERY, Lucious, Godfrey and WILLIAMS returned to the Clifford Street apartment, however, MILES noted that FNU LNU appeared as though he was being held against his will. MILES specifically remembered that FNU LNU was being escorted through the apartment door by WILLIAMS and ESCOFFERY who were holding the subject's arms behind his back in a custodial fashion. MILES claims that "ESCOFFERY" and Godfrey repeatedly asked FNU LNU about "the money" as they went through the subject's clothes and other belongings. MILES was led to believe that FNU LNU was addicted to crack cocaine and had "messed up the money" owed to ESCOFFERY and Godfrey.

13. At approximately 6 o'clock p.m., ESCOFFERY, Godfrey, Marty and WILLIAMS began to beat and kick the subject. This continued sporadically for approximately 30 minutes during which time they repeatedly asked the subject about money. The subject was left on the floor of the apartment while the other subjects ate dinner MILES and Marty walked several blocks to Popeye's Fried Chicken on Bull Street. Upon his return, Miles observed ESCOFFERY and Godfrey take FNU LNU to the bathroom. MILES recalled that the subject was bound, hands and feet, and gagged and placed in the bathtub. Marty turned the radio volume "all the way up" as ESCOFFERY pointed a silver 4" revolver with a pearl handle at the subject, shooting him

DEA Form — 6a
(May 1980)

DEA SENSITIVE
DRUG ENFORCEMENT ADMINISTRATION
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency to which loaned.

Previous edition may be used.

DATE: _____
DEFENSE COUNSEL _____
**THIS REPORT IS SUBMITTED TO DEFENSE COUNSEL PURSUANT TO THE PROVISIONS OF TITLE 18 U.S.C. 3500 BY AUSA**
RECEIVED BY _____

Exhibit-C

00___

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION<br>*(Continuation)* | 1. FILE NO.<br>G9-93-Z001 | 2. G-DEP IDENTIFIER<br>INC-31 |
|---|---|---|
| | 3. FILE TITLE<br>Harrington, Matthew | |

4.

Page 5   of 6

| 5. PROGRAM CODE | 6. DATE PREPARED<br>Sept. 29, 1993 |
|---|---|

once in the right chest and once in the right side of the head. ESCOFFERY then gave the gun to Godfrey who shot twice, although MILES believed the first of these missed the victim and ended up in the wall.

14.  After making sure the victim was dead, ESCOFFERY, WILLIAMS and Lucious wrapped the body in a red velvet bedspread and put the body in the trunk of a rental car.  MILES observed WILLIAMS and Lucious drive the body off.  MILES also observed ESCOFFERY break up the murder weapon and throw the pieces into a sewer opening at the apartment building.  Within a few weeks of the incident, MILES, WILLIAMS and ESCOFFERY moved to a house at 33rd Street near Lincoln Street.

15.  MILES stated that the house at 33rd and Lincoln was rented in the name of ESCOFFERY's girlfriend.  At first ESCOFFERY, MILES and WILLIAMS shared the house at the exclusion of any other occupants with the exception of a short stay by ESCOFFERY's associate from Florida, Malcolm LNU.

16.  During this period, MILES stated that nobody owned cars, rather they would have Lucious rent vehicles for them.  ESCOFFERY was operating a crack house at 38th and Atlantic Streets which he staffed with teenage boys he would recruit from the New York area. MILES recalled that the boys were cheated out of money by ESCOFFERY so they retaliated by stealing cocaine from the 33rd Street house and fleeing to New York.  MILES states that, on at least two occasions, ESCOFFERY would get quarter ounces of cocaine via the U.S. mail.

17.  Within several weeks of moving into the 33rd Street residence, ESCOFFERY and WILLIAMS had a falling out, which resulted in WILLIAMS and Lucious breaking off relationships with MILES and ESCOFFERY.  Subsequently, ESCOFFERY and WILLIAMS both moved out of the 33rd Street residence leaving MILES by himself.  ESCOFFERY would deliver quantities of crack cocaine to MILES on a daily basis and MILES would sell from the house and nearby street corners at the rate of approximately 1,000 dollars worth every two to three days.  MILES recalls that during this time ESCOFFERY would frequently arm himself with a black .38 caliber revolver.

DEA SENSITIVE
DRUG ENFORCEMENT ADMINISTRATION
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency to which loaned.

Previous edition may be used.

DATE: _____  THIS REPORT IS SUBMITTED TO
DEFENSE COUNSEL _____ PURSUANT TO
THE PROVISIONS OF TITLE 18 U.S.C. 3500 BY AUSA
_____ RECEIVED BY _____

91020072

INVESTIGATIVE SUMMARY


ON TUESDAY, 5 MARCH 1991, AT APPROXIMATELY 3:06 PM., THIS OFFICER
AND LT. ANDERSON OF THE BLOOMINGDALE POLICE DEPARTMENT, INTER-
VIEWED MR. JONATHAN D. KELTON AT THE BLOOMINGDALE POLICE DEPART-
MENT, BLOOMINGDALE, CHATHAM COUNTY, GEORGIA.   THE INTERVIEW WAS
RECORDED ON TAPE #2, SIDE A, 101-259 AND HAS BEEN MADE A PERMA-
NENT PART OF THIS CASE FILE. MR. KELTON (DANNY) APPEARED TO BE
EXTREMELY NERVOUS AND EVASIVE DURING THE INTERVIEW.   MR. KELTON
STATED, ESSENTIALLY, THE FOLLOWING:

THAT RICKEY CAME BY AROUND TWELVE NOON ON THE 26TH OF DECEMBER;
DANNY GAVE HIM A CHECK FROM WORLD AUTO BROKERS (JIMMY CRIBBS) FOR
APPROXIMATELY EIGHT HUNDRED DOLLARS; HE STAYED FOR A LITTLE BIT;
HE HELPED PUT A BUMPER ON; JOEY KELTON, BARRY WARLAW, (BARRY'S
AUTO MUFFLER), CHRIS, MIKE, THE CAR WASH GUYS WERE THERE; MIKE
FISHER WAS WORKING THAT DAY (SAME MIKE); HE TALKED ABOUT FUTCH;
HE WAS TRYING TO COLLECT MONEY FROM BUBBA FUTCH; HE TOLD DANNY
THAT AT LUNCH; HE EVEN WROTE IT DOWN ON PAPER HOW MUCH FUTCH OWED
HIM; BUT THE PAPER IS GONE; RICKEY CAME BACK AROUND SIX O'CLOCK
AND GAVE DANNY TWENTY DOLLARS; DIDN'T KNOW WHERE HE PARKED;
DIDN'T KNOW WHICH WAY RICKEY WENT WHEN HE LEFT; HE (DANNY) WAS
INSIDE;RICKEY WAS UPSET WITH HIM ABOUT JAMES WILLIAMS AND HIS
FRIENDS DRIVING HIS RED TRUCK; PETE BAR; HE GOT ON TO DANNY ABOUT
THE TRUCK; RICKEY WAS KIND OF DOWN; EVERYTHING WAS OKAY WHEN HE
LEFT; HE DIDN'T REALLY SAY ANYTHING WHEN HE LEFT; RICKEY OWNED A
GUN; IT WAS STOLEN; FIVE OR SIX MONTHS; THOUGHT KEN MC DUFFY HAD
STOLEN IT BECAUSE HE WAS ON CRACK; RICKEY SAID THAT HE WAS GOING
TO COLLECT SOME MONEY; THOUGHT IT WAS FROM FUTCH'S; CAN'T SAY
THAT WAS WHERE HE WAS GOING; ASSUME IT WAS;

DANNY STATED, ESSENTIALLY, THAT HE DID NOT KILL RICKEY; DID NOT
KNOW WHO KILLED RICKEY; THOUGHT IT MIGHT BE BUBBA FUTCH; RICKEY
TOLD DANNY THAT HE (RICKEY) HAD TOLD FUTCH THAT HE WAS GOING TO
GET HIS MONEY; RICKEY WAS DESPERATE FOR MONEY AND HE TRIED TO GET
HIS MONEY FROM FUTCH; FUTCH TRIED TO GIVE RICKEY SOME MONEY THAT
MORNING BUT RICKEY WOULD NOT TAKE IT; SAID HE WANTED IT ALL; RICK
TOLD ME THIS; FUTCH TRIED TO HAND HIM THREE HUNDRED DOLLARS; RICK
SAID NO - THAT HE WAS GOING TO GET HIS MONEY; THEY WOULD MEET AT
PLACES; FUTCH WOULD BEEP HIM AND HE WOULD MEET FUTCH; HE (DANNY)
TOLD RICK THAT THEY DIDN'T HAVE TO GET INVOLVED IN THAT; DRUG
MONEY; RICK WOULD GIVE FUTCH MONEY AND FUTCH WOULD USE THE MONEY
TO BUY DRUGS AND GIVE RICK HIS SHARE; FROM WHAT HE (DANNY) UNDER-
STOOD - IT GOT UP THERE PRETTY HIGH;

MR. KELTON EXPRESSED A MISTRUST OF THE POLICE AND A FEAR OF BUBBA
FUTCH.

( Exhibit-D )

MR. KELTON **AGREED** TO TAKE A POLYGRAPH CONCERNING THIS CASE.   THIS
OFFICER CONCLUDED THE INTERVIEW AT APPROXIMATELY 3:34 PM., SAME
DATE.


030791/dhs              ID DATA:   MR. JONATHAN D. KELTON
                                   W/M   DOB:   122865
                                   DANNY'S AUTO BODY
                                   437 STALEY AVE
                                   SAV'H, GA
                                   354-8656
                                   927-6950

91020072

INVESTIGATIVE SUMMARY


ON THURSDAY, 21 MARCH 1991, AT APPROXIMATELY 9:00 AM., THIS
OFFICER SPOKE WITH MR. JONATHAN D. KELTON AT THE BLOOMINGDALE
POLICE DEPARTMENT.  THIS OFFICER INFORMED DANNY THAT THE CONVER-
SATION WOULD NOT BE RECORDED AND THAT IT WOULD BE HELD CONFIDEN-
TIAL.  DANNY STATED, ESSENTIALLY, THE FOLLOWING:

THAT HE WAS AFRAID OF BUBBA FUTCH; HE WANTED TO COOPERATE, BUT HE
DID NOT WANT ANYTHING TO GET BACK TO BUBBA; BUBBA HAD CALLED AND
THREATENED HIM; HE HAD WITNESSED BUBBA BEAT UP TOM RAMSEY, AT HIS
(DANNY'S) SHOP; TOM OWED BUBBA SOME MONEY FOR SOME CRACK; THE
POLICE WERE NOT CALLED BECAUSE OF THE CIRCUMSTANCES; BUBBA WAS A
VIOLENT PERSON; HE (DANNY) HAD BEEN AVOIDING FUTCH; STAYING AWAY
FROM THE SHOP; HE ALWAYS MADE SURE THAT SOMEONE WAS WITH HIM AT
ALL TIMES; TAMMY FARROW HAD SAID THINGS ABOUT HIM (DANNY); SAID
THAT VIC HAD TOLD HER; NOT TO TELL TAMMY ANYTHING; TAMMY DOES
COCAINE; GETS IT FROM FUTCH; HAS SPENT THE NIGHT WITH FUTCH;
SAMMY KNOWS; SAMMY WAS LOOKING FOR HER; FOUND OUT LATER SHE WAS
WITH FUTCH; ABOUT A MONTH AGO; ON THE DAY RICK TURNED UP MISSING
HE TOLD ME (DANNY) THAT "FUTCH WAS FUCKING HIM (RICKEY); THAT HE
WAS GOING TO FUTCH'S TO COLLECT HIS MONEY; RICKEY TOLD HIM
(DANNY) THAT HE WOULD GIVE FUTCH MONEY; FUTCH WOULD BUY DRUGS
WITH IT; SELL THE DRUGS; MAKE A PROFIT; AND GIVE RICKEY HIS CUT;
RICKEY SAID THAT FUTCH WAS FUCKING HIM; THAT THE MONEY WAS GET-
TING UP THERE AND FUTCH WASN'T PAYING HIM; RICKEY HAD THREATENED
FUTCH ABOUT GETTING HIS MONEY; HE (DANNY) DIDN'T KNOW OF ANY
BLACK GUYS THAT HUNG AROUND THAT LIVED IN BLOOMINGDALE; HOWEVER,
SEVERAL MONTHS BACK RICKEY HAD A LONG CONVERSATION WITH A BLACK
GUY CALLED "DOG"; DIDN'T KNOW HIS REAL NAME; DIDN'T HEAR WHAT WAS
BEING SAID; BUT, THEY TALKED FOR A LONG TIME; A REAL ROUGH LOOK-
ING BLACK GUY; PROBABLY INTO DRUGS.

THIS OFFICER CONCLUDED THE INTERVIEW AT APPROXIMATELY 10:05 AM.,
SAME DATE.  MR. KELTON ADVISED THIS OFFICER THAT HE WOULD KEEP
HIS APPOINTMENT FOR A POLYGRAPH THIS TIME.


032191/dhs                ID DATA:  NA



( Exhibit-F )

91C20072

INVESTIGATIVE SUMMARY

ON SATURDAY, 6 APRIL 1991, AT APPROXIMATELY 11:00 AM., MR. JONA-
THAN D. KELTON WAS POLYGRAPHED BY MR. CHARLES M. MORRIS, JR., OF
VOLUNTEER POLYGRAPH SERVICE, AT THE BLOOMINGDALE POLICE DEPART-
MENT.  ACCORDING TO MR. MORRIS, MR. KELTON WAS INCONCLUSIVE ON
SEVERAL QUESTIONS AND DISPLAYED A KNOWLEDGE OF DECEIT WHEN ASKED
IF HE (DANNY) KNEW FOR SURE WHO KILLED RICKEY SPIVEY. REPORT
FORTHCOMING.

THIS OFFICER INTERVIEWED DANNY AFTER THE POLYGRAPH AND CONFRONTED
HIM ABOUT HIS PERFORMANCE.  DANNY STATED, ESSENTIALLY, THE FOL-
LOWING:

THAT HE WAS AFRAID; THAT THIS OFFICER SHOULD CHECK OUT BUBBA
FUTCH AND "DOG"; THAT HE DIDN'T SEE THEM KILL RICKEY; HE DIDN'T
KNOW HOW THEY KILLED RICKEY; BUT THAT HE KNEW IT; RICKEY TOLD HIM
THAT EVENING THAT HE WAS GOING TO FUTCH'S TO COLLECT HIS MONEY;
FUTCH KNOWS DOG; DANNY HAD SEEN FUTCH AND DOG TOGETHER; DOG WAS
NOBODY TO PLAY WITH; HE WOULD KILL YOU FOR FIVE HUNDRED DOLLARS
WORTH OF CRACK - THAT IS THE TALK; DOG AND THE PEOPLE HE HANGS
WITH ARE INTO DRUGS; DOG HASN'T CAME AROUND SINCE RICKEY WAS
DISCOVERED MURDERED; RICKEY SAID THAT HE WAS GOING TO BE A PLAY-
ER; HE WAS TALKING ABOUT THE DRUGS;

THIS OFFICER ADVISED DANNY TO GIVE DESCRIPTIONS OF DOG AND THE
PEOPLE AROUND HIM:

DOG - GOLD TOOTH/SHORT HAIR W/ CUT PART THAT HALF CIRCLES AROUND
B - SHORT, FAT, SAME HAIR, ABOUT 25
ANITA - GOLD TOOTH, SLENDER, ABOUT 26, DRIVES BLUE TOYOTA, HAS
        UZI MACHINE GUN
PETE - GOLD TOOTH, SAME HAIR, ABOUT 21, SHORT
REKEY - GOLD TOOTH, SAME HAIR, 21 OR 22, MEDIUM BUILD
SAN - SAME HAIR, CAN'T REMEMBER IF HE HAS GOLD TOOTH

DANNY IDENTIFIED THE PHOTOGRAPH OF JAMES WILLIAMS; HOWEVER, DANNY
INFORMED THIS OFFICER THAT JEROME DAVIS WAS NOT THE "DOG" HE WAS
REFERRING TO AND THAT MICHAEL C. WILLIAMS WAS NOT THE MICHAEL
WILLIAMS HE WAS REFERRING TO.

THIS OFFICER ADVISED DANNY THAT HE WOULD BE RESCHEDULED FOR
ANOTHER INTERVIEW.

040891/dhs                    ID DATA:  GUEST HOUSE RM 327

91020072

## INVESTIGATIVE SUMMARY

ON FRIDAY, 1 MARCH 1991, AT APPROXIMATELY 3:15 PM., THIS OFFICER
INTERVIEWED MS. KIMBERLY E. WILLIAMS AT THE BLOOMINGDALE POLICE
DEPARTMENT, BLOOMINGDALE, CHATHAM COUNTY, GEORGIA.   THIS INTER-
VIEW WAS RECORDED ON TAPE #2, SIDE A, 000-70, WHICH HAS BEEN MADE
A PERMANENT PART OF THIS CASE FILE. MS. WILLIAMS STATED, ESSEN-
TIALLY, THE FOLLOWING:

THAT SHE WAS A FRIEND OF RICKEY'S; HAD SEEN RICKEY ON THE 23RD OR
24TH; SAW EACH OTHER ONCE A MONTH; HE HAD STOPPED BY AFTER LUNCH
AND HE WASN'T ACTING NORMAL; HE SEEMED DOWN AND THAT ISN'T LIKE
HIM; HE'S NORMALLY REAL UPBEAT; HE WOULDN'T TELL ME AT FIRST WHAT
WAS WRONG; BUT LATER HE STARTED TALKING - AND IT WAS ABOUT MONEY
- WHICH WAS UNUSUAL FOR RICK; HE SAID THAT A MUTUAL FRIEND HAD
BORROWED $1,700.00 FROM HIM AND THAT HE WANTED TO GET IT BACK; HE
WAS TALKING ABOUT DANNY KELTON; HE SAID THAT HE WAS GOING OVER TO
TALK TO DANNY ABOUT IT; HE WAS GOING TO GET HIS MONEY BACK; HE
MADE THE STATEMENT THAT HE HAD TRIED TO HELP DANNY OUT - BUT THAT
PEOPLE HAVE TO WANT TO CHANGE - THAT YOU COULDN'T HELP WHITE
TRASH; ONCE YOU'RE POOR WHITE TRASH, YOU'RE ALWAYS POOR WHITE
TRASH; SHE HAD NEVER SEEN RICKEY LIKE THAT;

THIS OFFICER CONCLUDED THE INTERVIEW AT 3:23 PM., SAME DATE.


030491/dhs          ID DATA:  MS. KIMBERLY E. WILLIAMS
                              W/M  DOB:  020260
                              3211 PAULSON ST.,
                              SAV'H GA 31405
                              236-6199

( Exhibit-F )

031491/dhs                     ID DATA:  NA
91020072


                    INVESTIGATIVE SUMMARY


ON WEDNESDAY, 13 MARCH 1991, THIS OFFICER SPOKE WITH OFC. DAVID
DAUPHINEE, OF THE SAVANNAH POLICE DEPARTMENT, CONCERNING ROBERT
"BUBBA" FUTCH. OFC. DAUPHINEE ADVISED THAT HE WOULD MAKE AVAIL-
ABLE, TO THIS OFFICER, ANY INFORMATION THAT HE HAD CONCERNING MR.
FUTCH.  THIS OFFICER INFORMED OFC. DAUPHINEE THAT HE WOULD BE
GETTING BACK WITH HIM.  651-6676/944-7440.

ON WEDNESDAY, 13 MARCH 1991, AT APPROXIMATELY 1:20 PM., THIS
OFFICER INTERVIEWED MS. TAMMY W. FARROW, W/F, DOB: 081460, 1211
KING GEORGIA BLVD., APT #22, SAVANNAH, GA., 920-8242/TRIM LINE OF
SOUTH EAST GEORGIA, 25 POSEY ST., SAVANNAH, GA., 354-8000, AT THE
BLOOMINGDALE POLICE DEPARTMENT, BLOOMINGDALE, CHATHAM COUNTY,
GA..  THE INTERVIEW WAS RECORDED ON TAPE 3, SIDE A, 043-154, AND
HAS BEEN MADE A PERMANENT PART OF THIS CASE FILE.  MS. FARROW
STATED, ESSENTIALLY THE FOLLOWING:

THAT A FEW WEEKS BEFORE RICKEY'S DISAPPEARANCE LAMAR BURDETT HAD
TOLD HER THAT DANNY AND RICKEY HAD GOTTEN INTO A BIG FIGHT AND
THAT DANNY HAD SAID THAT " IF RICKEY EVER STARTED HIS SHIT AGAIN
THAT HE WOULD KILL HIM".  ACCORDING TO TAMMY, LAMAR ALSO STATED
THAT DANNY WENT OUT AND BOUGHT A GUN THAT DAY OR THE FOLLOWING
DAY.

MS. FARROW ALSO STATED, ESSENTIALLY, THE FOLLOWING:

AFTER RICKEY'S DEATH, MIKE LANE HAD TOLD HER HUSBAND THAT BUBBA
FUTCH HAD SAID THAT HE WAS GOING TO KICK DANNY'S ASS FOR GETTING
HIM INVOLVED IN THIS; THAT HE (FUTCH) HAD ENOUGH PROBLEMS.

THIS OFFICER CONCLUDED THE INTERVIEW AT 1:45 PM., SAME DATE.


031491/dhs                     ID DATA:  NA

91020072

## INVESTIGATIVE SUMMARY

ON TUESDAY, 19 MARCH 1991, AT APPROXIMATELY 9:48 AM., THIS OFFI-
CER INTERVIEWED.MR. TIMOTHY E. BUTTIMER OF GEORGIA FEDERAL.  THE
INTERVIEW WAS RECORDED ON TAPE 3, SIDE A, 230-254 AND HAS BEEN
MADE A PERMANENT PART OF THIS CASE FILE.  MR. BUTTIMER STATED,
ESSENTIALLY, THE FOLLOWING:

THAT HE HAD CALLED RICKEY ON THE DAY OF HIS DISAPPEARANCE AROUND
2:00 PM., CONCERNING SOME BANK NOTES; RICKEY SAID THAT HE WOULD
BE IN BY FRIDAY TO TAKE CARE OF THE NOTES; THAT HE (RICKEY) HAD
JUST SOLD SOME CARS; RICKEY DISAPPEARED THAT DAY; RICKEY HAD ONCE
TOLD HIM THAT HE HAD BOUGHT A BODY SHOP AND THAT THE GUY RUNNING
IT WAS STEALING HIM BLIND; DIDN'T KNOW ANYTHING ABOUT RICKEY
BEING MIXED UP IN DRUGS.

THIS OFFICER CONCLUDED THE INTERVIEW AT APPROXIMATELY 9:57 AM.,
SAME DATE.


031991/dhs            ID DATA:  MR. TIMOTHY E. BUTTIMER
                                W/M  DOB:  102455
                                25 SAPELO RD.
                                SAV'H, GA.
                                897-6050

1  A  Right, yes, sir.

2  Q  I see.  Okay.  The body shop with Danny Kelton.

3 Was there ever -- how did Mr. Kelton and his partners get

4 along?

5  A  Him and Barry was fine, but him and Mr. Spivey,

6 it was more of a cat and mouse show.  When Mr. Spivey

7 comes Danny would get itchy and run around the shop or

8 walk fast around the shop, and Mr. Spivey would go behind

9 him asking him why was this car here, why is this car?

10 Where is the money?  I need money.  And, this went on for

11 some time.

12  Q  What were their relative ages?  How old was Mr.

13 Kelton?

14  A  Mr. Kelton was about 26, 27.

15  Q  How about Mr. Spivey?

16  A  Late 30's, 35.

17  Q  So, he was a bit older?

18  A  Yes.

19  Q  Who appeared to be mostly in charge of the

20 legitimate aspects of the business?

21  A  Mr. Spivey.

22  Q  Was Mr. Kelton -- was he a co-owner of the

23 business, to your knowledge?

24  A  Yes, he was.

25  Q  Did Mr. Spivey know of the drug activities which

## AFFIDAVIT OF JAMES CLIFFORD WILLIAMS

BEFORE ME, the Undersigned Authority, Personally appeared James Clifford Williams after being Duly Sworn Deposes and State as follows:

1).    That I am currently incarcerated at Marianna Federal Correctional Institution, Federal prison in the State of Florida , and I am over 18 years of age.

2).    That I have Personal Knowledge of the FACTS and MATTERS that I state in this Affidavit.

3).    That I am COMPETENT to TESTIFY as to the FACTS and MATTERS that I state in this Affidavit.

4).    That I NEVER gave Al Goldwire Any Type of Cocaine what-so-ever and that Any Testimony in that behalf is Complete Perjury.

5).    That I first met Jamie Guzman through Lucious Bruce Johnson in 1989 in New York (Exhibit-     ) and that I NEVER Invited Jamie Guzman to Savannah, Ga. and that Jamie Guzman have NEVER been to Any Residence in Savannah, Ga. that I know of and that I NEVER brought crack cocaine or Did I cooked cocaine into crack as he (Guzman) testified to.

6).    That Lucious Bruce Johnson Committed Complete Perjury Testimony by stating that I had participated in the murders of the Unknown black male and Mr. Ricky Spivey, because I Did Not participate in Any murder what-so-ever and Do Not know of whom actual committed the murders.

7).    That Lucious Bruce Johnson Committed Complete Perjury Testimony by stating that I supplied Al Goldwire, Matthew Harrington, and Others with cocaine or crack cocaine.

8).    That Lucious Bruce Johnson Committed Perjury Testimony by stating that I Owned or Possessed Any Type of Gun because I Did Not and Do Not Owned nor have I Ever Possessed Any Type of Gun.

9).    That the Triple beam balance scale, Pringles potato chip can with false bottom and All of the cocaine and crack cocaine that was presented in State Court and Federal Court belongs to Lucious Bruce Johnson and that Lucious Bruce Johnson brought the items to the Resident that was searched on August 11, 1992 (Exhibit-I & J     ).

10).    That Lucious Bruce Johnson Stole my son's Mother (Felicia Rutledge) Driven Licenses and the Delta Airlines ticket (in the name of Ronnie Miles) and Placed them with his (Lucious Bruce Johnson's) items that were in the Dumpster at 49th & Waters.



1 of 3

11).   That on August 11, 1992, Lucious Bruce Johnson was "DIRECTED" to bring his cocaine to 326 Linwood address to "TRAP" me, and it shows that he (Johnson) kept his cocaine with him because both were found in the bathroom together (Johnson & The Cocaine).

12).   That Lucious Bruce Johnson have Completely Turn the Case in the Eyes of Justice to Make me Look as Though I'm him by Changing places with me.

13).   That Agent Madeleine Pinckney Committed Complete Perjury Testimony about "I made statements about criminal activities. Also I continued to REQUEST for a Lawyer but Agent Craig Smith continued to tell me that I Could Not have a Lawyer and to just sign the Damn Card in front of me and that I was going towork for the Federal & State Authorities (Cooperate), whether I Like it of Not and Agent Madeleine Pinckney participated.

14).   That Joseph Kelton Committed Complete Perjury Testimony.

15).   That Jonathan D. Kelton (Danny) Committed Complete Perjury Testimony (Exhibit- D & E-G     ).

16).   That Agent Craig Smith attempt to get me to be a Federal & State Authority Informant and because I Refused he (Smith) Allowed All the Other Government Witnessess to Committ Perjury while he (Smith) Along with Others Covered it Up.

17).   That Ronnie Miles Committed Complete Perjury TEstimony.

18).   That I Repeatedly stated to Trial Counsel that All of the Government Witnessess were Committing Perjury and that he should use the DEA-6's, Other Reports, and the Trial TEstimony to show that the Government Witnessess were LIEING on me but Counsel REFUSE.

19).   That Trial Counsel REFUSE to ask me Questions in a Professional Manner, so that I could have shown the Perjury Testimony.

20).   That Trial Counsel REFUSE to call Bubba Daiss to Testify that he NEVER gave Jonathan D.Kelton $1,000.00 to pay for the murder of Mr. Ricky Spivey, nor has he (Daiss) participated in the murder of Mr. Ricky Spivey or Anyone (Exhibit- M & N).

21).   That Trial Counsel REFUSE to use Exhibit-L, toshow that No one by the name of "FRANK" worked at Danny's Shop as Lucious Bruce Johnson stated in the DEA-6 Reports, and in the Trial Testimony, in which is Perjury Testimony.

22).   That Trial Counsel & Appellant Counsels were Completely Inadequate/Ineffective in behalf of Case No.CR493-82.

23).   That I Explain to Trail Cousel & Appellant Counsel that I Excepted Lucious Bruce Johnson's cocaine charge (along with all of the other items) for the August 11, 1992 arrest because they (Agent Smith and Others) were trying to charge my son's Mother (Felicia Rutledge).

James C. Williams
James Clifford Williams

2 of 3

STATE OF FLORIDA )
               ) ) s.s.:
COUNTY OF JACKSON )

The foregoing instrument was acknowledged before me this 2 o th day
October, 2000, by James Clifford Williams who has produced an Inmate
I.D. card as Identification and who Did take an Oath.

10/20/00
Date

Notary Public

**STERLING DARNELL DAWSON**
Notary Public, State of Florida
My comm. expires July 25, 2003
Comm. No. CC857753

3 of 3

| | 1 FILE NO. | 2. G-DEP IDENTIFIER |
|---|---|---|
| **REPORT OF INVESTIGATION** | G9-91-0012 | KA2-C1 |

*(Continuation)*     THIS REPORT IS SUBMITTED TO
~~DATE~~                                          PURSUANT TO
~~DEFENSE COUNSEL~~
Page 3  of 6     THE PROVISIONS OF TITLE 18 U.S.C. 3500 HARRINGTON, Matthew
                                          ~~RECEIVED BY~~

| .OGRAM CODE | 6. DATE PREPARED |
|---|---|
| N/A | August 25, 1992 |

Savannah.

11.  During February 1989 until December 1990, the CI. WILLIAMS and Felicia RUTLEDGE moved to Albany, New York from Savannah.  The CI stated that they moved to WILLIAMS' grandmother's house located at 97th and 3rd Avenue.  The CI stated that WILLIAMS occasionally brought cocaine back to Savannah on some trips.  The CI stated that WILLIAMS owes MALCOLM approximately $15,000.00 to $20,000.00 in back drugs payments.  The CI stated that MALCOLM is currently living in North Carolina.  After returning to Savannah around December of 1990, WILLIAMS hooked up with Matthew HARRINGTON.  In the early part 1988, The CI stated that HARRINGTON was purchasing crack cocaine from WILLIAMS over an 8 month period. The CI stated that HARRINGTON was purchasing approximately two ounces of crack cocaine from WILLIAMS approximately every two days in order for HARRINGTON to supply the Carver Village area.  When WILLIAMS returned to Savannah, Matthew HARRINGTON fronted WILLIAMS four ounces of crack cocaine in order for WILLIAMS to start his business again. HARRINGTON charges WILLIAMS approximately $1,200.00 per ounce for the crack cocaine.  The CI stated that WILLIAMS was purchasing approximately one half a kilogram of crack cocaine every week during the time period of December 1990 until August of 1991.  The CI stated that during this same time period, the following people were working for WILLIAMS.

8/27  st

**DEA SENSITIVE**
DRUG ENFORCEMENT ADMINISTRATION
This report is the property of the Drug Enforcement Administration.

(Exhibit H)

Case 4:00-cv-00485-AAA    Document 6    Filed 10/24/00    Page 74 of 94

THIS REPORT IS SUBMITTED TO
PURSUANT TO HARRINGTON, Matthew
THE PROVISIONS OF TITLE 18 U.S.C. 3500 BY AUSA

Page 4 of 6

DATE: _____

DEFENSE COUNSEL _____

RECEIVED BY _____

ROGRAM CODE
N/A

5. DATE PREPARED
August 25, 1992

Parrish SHIELD
Carl DOUGLAS, AKA B
Enrique RUTLEDGE
Tyrone ARKWRIGHT, AKA TY

12.  In August of 1991, the CI traveled back to the New York area and resided there until November 1991.  The CI stated that he/she met with WILLIAMS after returning back into the Savannah area around December 1991.

13.  The CI stated that he/she had traveled down to the Ft Lauderdale, Florida area and acted as a driver for Matthew HARRINGTON when HARRINGTON was purchasing cocaine in Miami. The CI stated that HARRINGTON would get anywhere from up to a kilogram of cocaine along with his brother, Johnny HARRINGTON, AKA Frog, would also purchase a kilogram of cocaine. Angela HARRINGTON, AKA Moe, would purchase a quarter kilogram and Joseph MCCLOUD, AKA PUMPKIN, would also purchase a quarter kilogram.  The CI stated that Randy KNOX worked for Matthew HARRINGTON.  The CI also stated that Buford HARRINGTON who is the brother of Matthew and Johnny HARRINGTON also worked for Matthew HARRINGTON.  The CI stated that Buford HARRINGTON is a frequent drug user.

## NON-DRUG RELATED INFORMATION

None

## FINANCIAL INFORMATION

None

## OTHER OFFICERS

1. Sgt Irene Pennington, Metro Drug Squad
2. TFO Bernie Smalls, Metro Drug Squad
3. TFO Vic Gordon, Metro Drug Squad
4. Det Rick Dailey, Metro Drug Squad

## INDEXING SECTION

1. LNU, FNU, AKA CAMEO, NADDIS NR, Jamaican Male, Hgt: Approx 5'11", Wgt: 150, Age: Approx 31 yrs

2. LNU, CHRIS, NADDIS NR, Jamaican Black Male, Hgt: 6', Wgt: 165, Age: Approx 25 or 26, Cousin to Carl Douglas

8/27  st

DEA Form — 6a
(May 1980)

DEA SENSITIVE
DRUG ENFORCEMENT ADMINISTRATION
This report is the property of the Drug Enforcement Administration.

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | | | | Page 1 of 1 |
|---|---|---|---|---|
| **1. PROGRAM CODE** | **2. CROSS FILE** | **RELATED FILES** | **3. FILE NO.** GG9-91-0012 | **4. G-DEP IDENTIFIER** KA2-C1 |

| | | |
|---|---|---|
| **5. BY:** S/A Craig P. Smith | x ☐ SG9-92-X022 | **6. FILE TITLE** |
| **AT:** Savannah RO | ☐ ☐ ☐ | Harrington, Matthew |
| **7.** ☐ Closed  ☐ Requested Action Completed<br>☐ Action Requested By | | **8. DATE PREPARED** August 4, 1992 |

**9. OTHER OFFICERS:** S/A David Wolff, Det. Victor Gordon, Det. Rick Dailey. Det. Bernie Smalls, Chatham County PD

**10. REPORT RE:** Meeting with SG9-92-X022 on 29 July, 1992 Acquisition of Exh. N-16, N-17 and N-18

Details

1.   On July 29, 1992, S/A Craig P. Smith and the above listed officer's met with DEA Cooperating Individual (CI) SG9-92-X022 hereafter referred to as the CI at a prearranged location in Savannah, Georgia.

2.   Once at the pre-arranged location, the CI produced the following items which were obtained from James WILLIAMS aka Swinger.

1.   Triple beam balance scale.
2.   Ruger 44 mag. pistol serial number 85-84052 this weapon was completely loaded.
3.   A Pringles Original Potato Crisp container with a false bottom; which contained seven quarter ounce packages of crack cocaine.
4.   A plastic bag containing twelve quarter ounce packages of crack cocaine to include a small blue plastic bag containing small pieces of crack cocaine.  Also included with the packages of crack cocaine were numerous small plastic baggies.  Total weight of the suspected crack cocaine contained in the hidden compartment of the Pringles canister was 35.7 grams.  The total weight for the additional twelve bags and the blue plastic bag was approximately seventy (70) grams.

The above listed items were photographed and subsequently labeled Exhibit N-16. The CI stated that James WILLIAMS, aka Swinger, gave the above listed items to the CI the previous evening.  The CI stated that immediately following the sale of the previous cocaine that was purchased by James WILLIAMS, WILLIAMS told the CI that the CI would travel back to the New Jersey area in order to obtain

| **11. DISTRIBUTION:** | **12. SIGNATURE (Agent)** | **13. DATE** 8/4 |
|---|---|---|
| **REGION** | S/A | |
| **DISTRICT** Atlanta | **14. APPROVED** | **15. DATE** 8-6-9 |
| **OTHER** AMRI | | |

THIS REPORT IS<br>DEFENSE COUNSEL<br>THE PROVISIONS OF TITLE 18 U.S.C.<br>RECEIVED BY

DEA ✓ MDS

**REPORT OF INVESTIGATION**
*(Continuation)*

| | |
|---|---|
| 1 FILE NO. G9-91-0012 | 2 G DEP IDENTIFIER KA2-C1 |
| 3. FILE TITLE Harrington, Matthew | |

Page 2  of 4

5. PROGRAM CODE

6. DATE PREPARED

August 4, 1992

another package of cocaine. The CI stated that James WILLIAMS wanted the CI to take approximately eight thousand dollars back to New Jersey. The CI stated that reservations were made at the Savannah International Airport but were later canceled due to other plans. The CI stated that after leaving the residence of James WILLIAMS mother's house located on 50th Street, WILLIAMS proceeded to the house located on Lynnwood Avenue. There at this residence, James WILLIAMS aka Swinger cooked up the cocaine hydrochloride to obtain crack cocaine. The CI stated that the cocaine was cooked in a large glass bowl.

3.  Immediately following this meeting Det. Victor Gordon and Det. Rick Dailey transported the CI to a known location where James WILLIAMS had deposited the glass bowl in which the cocaine was processed. The CI stated that WILLIAMS had deposited the items in a trash container located in Savannah, Georgia. The following items were retrieved from the trash container;

1.  One torn up Delta Airlines boarding pass, ticket info. book and ticket remnants. The name appearing on the ticket was that of Ronnie MILES. Total price for the ticket was $260.00.
2.  Two socks, green, purple and white color containing a razor blade with suspected crack cocaine residue.
3.  Georgia driver's license of Felicia A. RUTLEDGE license number 253472590 expiration date 10/14/94, DOB 10/14/69, is described as a black female, 5'5", 127 lbs.
4.  A white piece of paper containing four different numbers. They are the initials E.G. has the number 201-309-3483, and 471-1342; the name Tony with an "E" underneath it. has the number 201-458-2315 and 201-656-7105.
5.  Contains a glass pot which is a light brown clear in appearance which was broken in several pieces, glass appears to have cocaine residue. Special note, Chatham County Police Dep. was able to obtain one finger print from the glass pot.

Items 1 through 4 listed above are being processed as evidence and is subdequently labeled Exhibit N-17. Item 5 was labeled Exhibit N-18. The trash dumpster was located at 49th and Waters. The time

DATE: _____ THIS REPORT IS SUBMITTED TO
DEFENSE COUNSEL _____ PURSUANT TO
THE PROVISIONS OF TITLE 18 U.S.C. 3500 BY AUSA

DEA SENSITIVE
DRUG ENFORCEMENT ADMINISTRATION

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency to which loaned.

DEA Form — 6a
(May 1980)

ment of Justice

cement Administration

**REPORT OF INVESTIGATION**
*(Continuation)*

| 1 FILE NO | 2 G DEP IDENTIFIER |
|---|---|
| G9-91-0012 | KA2-C1 |

3. FILE TITLE

Harrington, Matthew

4. Page 3 of 4

5. PROGRAM CODE

6. DATE PREPARED

August 4, 1992

of retrieval for the above listed items was approximately 1800 hours. After the items were retrieved from the dumpster, the CI departed the area in order to meet up with James WILLIAMS.

4. On July 30, 1992, SG9-92-X022 met with James WILLIAMS aka Swinger. During this particular day, the CI stated that James WILLIAMS was going around Savannah collecting money in order to obtain funds for his next trip. During this time, the CI stated that WILLIAMS collected $150.00 from Tyrone ARKWRIGHT aka TY. While driving around Savannah, Georgia WILLIAMS met up with Matthew HARRINGTON on Wheaton Street. During this meeting with HARRINGTON, WILLIAMS showed HARRINGTON some of the crack cocaine that he had recently processed but HARRINGTON stated that he did not want the dope. HARRINGTON told WILLIAMS that he wanted to purchase a half kilo of powder cocaine. HARRINGTON also told WILLIAMS that he lost approximately $50,000.00 on the road. HARRINGTON told WILLIAM that he had the money but would not purchase the cocaine until he could visually inspect it. During this meeting between HARRINGTON and WILLIAMS, HARRINGTON's sister Angela was asked by Matthew if the deal sounded good and Angela replied whatever. The CI stated that money man was selling crack cocaine for Matthew HARRINGTON.

5. The CI stated that the following is a breakdown of the one half kilo of cocaine that was brought to Savannah, Georgia by James WILLIAMS aka Swinger. They include:

1. FNU LNU aka Rocky one bag of the cocaine hydrochloride for approximately $3,500.00.
2. Leonard MOORE obtained one bag of cocaine hydrochloride and paid approximately $3,500.00.
3. Enrieque RUTLEDGE receive a half ounce.
4. Parrish SHIELDS received a half ounce.
5. Carl DOUGLAS aka Dewayne Mcferson also received a half ounce
6. Tyrone ARKWRIGHT received an ounce and a half.

DATE: _____ **THIS REPORT IS SUBMITTED TO**
**DEFENSE COUNSEL** _____ **PURSUANT TO** .
**THE PROVISIONS OF TITLE 18 U.S.C.** 3500 BY AUSA
_____ **RECEIVED BY** _____

DEA Form — 6a
(May 1980)

**DEA SENSITIVE**

**DRUG ENFORCEMENT ADMINISTRATION**

This report is the property of the Drug Enforcement Administration.

Neither it nor its contents may be disseminated outside the Agency to which loaned.

| REPORT OF INVESTIGATION | 1 FILE NO | 2 G DEP IDENTIFIER |
|---|---|---|
| *(Continuation)* | G9-91-0012 | KA2-C1 |

3. FILE TITLE

Harrington, Matthew

Page 4   of   4

5. PROGRAM CODE

6. DATE PREPARED

August 4, 1992

## Custody of Evidence

1.   Exhibit N-16 consists of pictures taken by S/A Smith and Det. Dailey on 7/29/92.   Items photographed were scales, gun and crack cocaine.   S/A Smith maintained custody of said exhibits until turned over to the Savannah RO Custodian of Non-Drug Evidence.

2.   Exhibit N-17 consists of the above listed items in the report that were retrieved from a trash container located on 49th and Waters in Savannah, Georgia.   These items were placed there by James WILLIAMS aka Swinger.   These items were retrieved by Det. Dailey and Det. Gordon and were turned over to S/A Smith who maintained custody of said Exhibit until turned over to the Savannah RO Custodian of Non-Drug Evidence.

3.   Exhibit N-18 consists of a light brown glass pot that was broken in several pieces and was retrieved from a trash container on 7/29/92.   The glass pot was retrieved by Det. Dailey and Det. Gordon and was turned over to S/A Smith who maintained custody of said exhibit until turned over to the Savannah RO Custodian of Non-Drug Evidence.

## Indexing Section

1.   WILLIAMS, James aka Swinger - Naddis 3143618.
2.   HARRINGTON, Matthew - Naddis 2930023.
3.   HARRINGTON, Angela - Naddis 2856570.
4.   DOUGLAS, Carl - Naddis 3143628.
5.   RUTLEDGE, Felicia - Naddis 3143709.
6.   SHIELDS, Parrish - Naddis 3148563.
7.   RUTLEDGE, Enrieque - Naddis pending.
8.   LNU, FNU, aka Rocky - Naddis NR.
9.   ARKWRIGHT, Tyrone - Naddis NR.

DATE: _____   THIS REPORT IS SUBMITTED TO
DEFENSE COUNSEL _____ PURSUANT TO
THE PROVISIONS OF TITLE 18 U.S.C. 3500 BY AUSA
RECEIVED BY _____

DEA SENSITIVE
DRUG ENFORCEMENT ADMINISTRATION
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency to which loaned.

Previous edition may be used.

DEA Form — 6a
(May 1980)

METRO DRUG SQUAD
REPORT OF INVESTIGA'

CRI

*Evidence found in Dumpster*

Pag

------------------------------------------------
BY:      Det. R. J. Dailey            Det

DATE:    July 29, 1992
------------------------------------------------
REPORT REFERENCE
NAME:                 JAMES WILLIAMS
ADDRESS:
------------------------------------------------

        On July 29, 1992, this investigator and Det. Gordon met with
CI #SG9-92-X022 at a prearranged location.   The purpose of the
meeting was to inspect some evidence in the possession of the CI.
The CI advised these investigators that **James WILLIAMS aka Swinger**
had given the CI a quantity of Cocaine, scales, and a pistol to
hold for him.

        Upon meeting with the CI, DEA Agents C. Smith and D. Wolfe
arrived.   The CI took a blue garment bag from his vehicle and
revealed to these investigators, contained therein, a quantity of
crack/cocaine, packaged in what appeared to be 1/4 ounce amounts.
This crack/cocaine was concealed in a Piggly Wiggly plastic bag.

        The CI then produced a Pringle's potato chip can that had a
false bottom that detached.   This can allowed an area of almost 1/2
the can for concealment of items.   Crack/cocaine was concealed in
the can.   Again in what appeared to be 1/4 ounce amounts.   The can
had a foil cover over the top, and a plastic resealable lid.   When
shook by this investigator it sounded as if the top half of the can
contained potato chips.   The CI then produced a set of Ohaus
scales, and a blue metal .44 Magnum Ruger Super Blackhawk pistol,
revolver, fully loaded.

        The CI advised that all the aforementioned items had been
given to him by **James WILLIAMS** to keep until such time that
**WILLIAMS** contacted the CI for any one, or all, of the items.

        This investigator photographed all the items using a 35mm
camera.   The film was given to DEA Agent Smith.

        Agents Smith and Wolfe weighed the cocaine.

/jm 08/04/92

------------------------------------------------
                                    |   Det. R. J. Dailey
REPORTING OFFICER: _R. J. Dailey_____
APPROVED BY: _Sct. Del Pennington_____

METRO DRUG SQUAD
.EPORT OF INVESTIGATION
CRN:

Page 2  of  2 Page[s]
------------------------------------------------------------

REPORT REFERENCE:        JAMES WILLIAMS

------------------------------------------------------------


    While speaking with the CI, the CI advised that the pot
**Swinger** had used to convert the cocaine into crack was in a
dumpster located at 49th Street at Waters Avenue.  The CI advised
that the CI was present when the pot was thrown into the dumpster
on July 29, 1992.  The CI advised the pot was in a brown paper bag
approximately 4 feet in length.   The CI described the pot as a
brown glass Visionware type.

    At approximately 4:55 P.M., this investigator and Det. Gordon
located the dumpster and retrieved a bag matching the description
given by the CI.   Upon inspecting the bag, the pot was located
inside among other trash and food debris.   The pot was a brown
glass Visionwear saucepan and was found in pieces.   The interior
surfaces of the pot were covered in what appeared to be
crack/cocaine.

    Also in the bag was a GA driver's license #253473590 belonging
to **Felicia A. RUTLEDGE**, [**James WILLIAMS** girlfriend and room-mate]

    A Delta Airlines boarding pass and information booklet was
also in the bag.  The boarding pass had been torn up, but the date
of July 28, 1992 and name of **Ronnie MILES**, along with a Newark,
New Jersey, designation was plainly visible.

    A pair of multi-colored socks, rolled into a ball, was found
to contain a razor blade with what appeared to be cocaine residue.
[This investigator covered the razor's edge with tape to secure the
residue and prevent injury in handling].

    A blue and white sheet from some type of memo book was found,
it listed two names and four phone numbers, area code New Jersey.

    The items were listed as evidence, and they were photographed
by Cpl. Hoyser of the CCPD Identification Unit.   The pot was
scraped clean of all residue and fingerprinted.  Cpl. Hoyser found
one latent print he believes comparable to a suspect.

    All items listed on property receipt and turned over to DEA
Agent Smith on August 3, 1992 by Det. Gordon

/jm 08/04/92

------------------------------------------------------------
                                        Det. R. J. Dailey
REPORTING OFFICER:

# METRO DRUG SQUAD  -  CHATHAM COUNTY

## RECEIPT FOR PROPERTY

№ 0499                                         9

| OF PERSON FROM WHOM PROPERTY WAS OBTAINED | ADDRESS | | |
|---|---|---|---|
| ☐ OWNER  ☑ OTHER  FOUND PROPERTY | 49th & WATERS AVE SAV GA | | |
| LOCATION WHERE PROPERTY WAS OBTAINED | DATE | TIME | |
| TRASH BAG IN DUMPSTER | 29 JUL 92 | 1730 1425 AM/PM | |

| NO. | QUANTITY | DESCRIPTION OF PROPERTY. (Include model, serial number, identifying marks, condition, and value, when appropriate.) |
|---|---|---|
| 1 | ONE | BROKEN VISION WARE POT, BROWN GLASS, WITH SUSPECTED COCAINE RESIDUE ADHERED TO SURFACE. |
| 2 | ONE | BLUE AND WHITE SHEET FROM A MEMO BOOK LISTING "EG 201-309-3483", "471-1342" "TONY E", "201-458-2315", "201-656-7105" |
| 3 | ONE | GEORGIA DRIVERS LICENSE, # 253473590, FELICIA A RUTLEDGE, 1502 E 38th ST SAV GA.  #386 84947 |
|  |  | CONTINUED ON # 0486 |

NAME AND BADGE NUMBER OF AGENT OBTAINING PROPERTY

SIGNATURE  RJ Dailey

BADGE NUMBER  923

## CHAIN OF CUSTODY

| ITEM NO. | DATE | RELINQUISHED BY | RECEIVED BY | PURPOSE OF CHANGE OF CUSTODY |
|---|---|---|---|---|
| 3 | 7-29-92 | SCENE | RJ DAILEY | SAFE KEEPING EVIDENCE |
|  | 7-30-92 | DAILEY | | PHOTOS & PRINTING |
|  | 8-3-92 | | DAILEY | SAFE KEEPING |
| 3 | 8-3-92 | DAILEY | U.R. Marsh | TRANSPORT TO DEA |
| 3 | 8-3-92 | J.R. Marsh | C.P. Smith | |

| REPORT OF INVESTIGATION | | | | Page 1 of 3 |
|---|---|---|---|---|
| PROGRAM CODE | 2. CROSS FILE | RELATED FILES | 3. FILE NO. G9-91-0012 | 4. G-DEP IDENTIFIER KA2-C1 |

5 BY S/A Craig P. Smith
AT Savannah RO

6. FILE TITLE
**Harrington, Matthew**

7. ☐ Closed  ☐ Requested Action Completed  ☐ Action Requested By

8. DATE PREPARED
October 28, 1992

9 OTHER OFFICERS S/A David Wolff, TFO James Pierce, Det. Vic Gordon, Det. Irene Pennington, Det. Bernie Smalla Metro Drug Task Force

10 REPORT RE    Execution of State Search Warrant at 326 Linwood Road, Savannah, GA/Acquisition of Exhibits N-26 thru N-42 and N-44

Synopsis

On August 11, 1992, agents from the Metro Drug Squad, Chatham County Police Department executed a state search warrant at 326 Linwood Road, Savannah, Georgia. Reference is made to a Metro Drug Squad Report of Investigation dated August 11, 1992 by Det. J. A. Pierce.

Details

1. On August 11, 1992, Det. J. A. Pierce obtained a search warrant for the residence located at 326 Linwood Road, Savannah Chatham County Georgia. At approximately 1:00 p.m., on this date, the search warrant was executed for this residence. During the execution of the search warrant, James Cliffcrd WILLIAMS aka Swinger and Santonio Maurice BRIGHT were arrested for possession of a controlled substance in violation of O.C.O.G. 16-13-30a.

2. After securing the premises, the search of the residence was commenced by the above listed agents and officers with TFO James Pierce and S/A Craig Smith acting as the seizing agents of all evidence at the above premises. A copy of the inventory list made at the premises during the execution of the search warrant is attached to and is part of the instant report.

3. Following is a list of non-drug evidence and a description of each respective exhibit.

a. Exhibit N-26 consists of two motorola digital beepers taken from the master bedroom.
b. Exhibit N-27 consist of two motorola beepers taken from the person of James Clifford WILLIAMS aka Swinger.

| 11 DISTRIBUTION | 12. SIGNATURE (Agent) S/A Craig P. Smith | 13. DATE 11-3-9 |
|---|---|---|
| REGION | | |
| DISTRICT Atlanta | 14 APPROVED (Name and Title) Douglas D. Driver, RAC | 15 DATE 11-3-92 |
| OTHER  AMRI, OC, DIG | | |

DEA Form 6
(May 1980)

DEA SENSITIVE
DRUG ENFORCEMENT ADMINISTRATION
This report is the property of the Drug Enforcement Administration
......... it nor the contents may be disseminated outside the agency to which loaned

DATE:
DEFENSE COUNSEL _____
THIS REPORT IS SUBMITTED 1
PURSUANT 1
THE PROVISIONS OF TITLE 18 U.S.C. 3500 BY AUS_
RECEIVED BY _____

(Exhibit-J)

| REPORT OF INVESTIGATION | 1. FILE NO | 2 G-DEP IDENTIFIER |
| | G9-91-0012 | KA2-C1 |

**REPORT OF INVESTIGATION**
*(Continuation)*

3. FILE TITLE

**Harrington, Matthew**

4.

Page 2 of 3

5. PROGRAM CODE

6. DATE PREPARED

October 28, 1992

c.   N-28 consists of miscellaneous papers that were taken from the person of James WILLIAMS.

d.   N-29 consists of plastic baggies found in the middle bedroom.

e.   N-30 consists of plastic baggies found in the air conditioner duct of the hallway.

f.   N-31 consists of a date organizer book, maroon in color, that was found in the middle bedroom.

g.   N-32 consists of a date organizer, black in color, that was found on the top of the television located in the living room area.

h.   N-33 consists of a Pringles potato chip can containing a false bottom that was located in the master bedroom.

i.   N-34 consists of miscellaneous papers found in the left night stand located in the master bedroom.

j.   N-35 consists of miscellaneous papers found in the triple dresser located in the master bedroom.

k.   N-36 consists of miscellaneous papers found in a pocket book that was recovered in the master bedroom.

l.   N-37 consists of miscellaneous papers taken from the dresser of the master bedroom.

m.   N-38 consists of miscellaneous photographs that were found in the closet of the master bedroom.

n.   N-39 consists of miscellaneous photographs taken from the middle bedroom.

o.   N-40 consists of miscellaneous papers from the right night stand located in the master bedroom.

p.   N-41 consists of miscellaneous papers taken from the middle bedroom dresser.

q.   N-42 consists of two photographs taken from the master bedroom.

r.   N-44 consists of a triple beam balance scale that was located on the dining room table of the dining room area.

4.   The following drug exhibit was located in the bathroom of the master bedroom.

a.   Exhibit 14 consists of two sandwich type plastic bags seized by S/A Craig P. Smith at the above residence.   S/A Smith seized exhibit 14 and maintained custody of said exhibit until turned over to the South East Regional Laboratory in Miami, Florida.   The two plastic bags consisted of approximately a quarter kilogram of cocaine hydrochloride.

THIS REPORT IS SUBMITTED TO
DATE: _____
PURSUANT TO
DEFENSE COUNSEL _____
THE PROVISIONS OF TITLE 18 U.S.C. 3500 BY AUS
RECEIVED BY _____

DEA SENSITIVE
DRUG ENFORCEMENT ADMINISTRATION
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency to which loaned.

| REPORT OF INVESTIGATION | 1. FILE NO. GS-91-0012 | 2. G DEP IDENTIFIER KA2-C1 |
|---|---|---|
| (Continuation) | 3. FILE TITLE Harrington, Matthew | |

Page 3 of 3

| 5. PROGRAM CODE | 6. DATE PREPARED March 28, 1992 |
|---|---|

<u>Custody of Evidence</u>

1.    Exhibits N-26 thru N-42 and N-44 were seized during the execution of a search warrant and 326 Linwood Road, Savannah, Georgia.   The above listed items were seized by S/A Craig P. Smith and TFO James Pierce.   S/A Smith maintained custody of said exhibits until turned over to the Savannah RO custodian of non-drug evidence.

<u>Indexing Section</u>

1.  WILLIAMS, James Clifford aka Swinger - Naddis 3143618.
2.  BRIGHT, Santonio Maurice - Naddis Negative, is described as a black male approximately 20 years of age, 5'11", 200lbs, brown eyes, black hair, SSN: 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, DOB: 10/8/71, address: 1226 Sherman Avenue, Savannah, Georgia, Telephone Number 355-7045, Dln same as SSN.



DATE: _____ THIS REPORT IS SUBMITTED TO
DEFENSE COUNSEL _____ PURSUANT TO
THE PROVISIONS OF TITLE 18 U.S.C. 3500 BY AUSA
_____ RECEIVED BY _____

DEA SENSITIVE
DRUG ENFORCEMENT ADMINISTRATION
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency to which loaned.

Case 4:09-cv-00089-AAA Document 1 Filed 07/24/09 Page 85 of 94

## CRIMINAL WARRANT

Recorder's Court of Chatham County
(Name of Court)

STATE OF GEORGIA, Chatham County

Personally came **DET. V.R. GORDON** who on oath says tha

to the best of his knowledge and belief **James Clifford Williams, Jr.**, did, on the **11th** day
(Name of Defendant)

**August** in the year Nineteen-Hundred and **92**, in the county afor
said commit the offense of **Trafficking in Cocaine, in violation of GA State Code 16-13-31(a)**
(Describe Offense)

at approximately **1:30** XXXX (A M)(P M) again
(A M)(P M)

**State of Georgia**
(Name of Victim)

by **Trafficking in Cocaine, in violation of GA State Code 16-13-31(a) at 326 Linwoo Dr., Savannah, Chatham County, GA**
(If larceny describe property alleged to have been stolen with a description thereof, the name of the owner, the value of such property and the name of the person from whose possession such property was taken )

Sav , Ch Co , (

and this deponent makes this affidavit that a warranty may issue for the arrest of said defendant

Sworn to and subscribed before me, this **13** day of **Aug**, 19 **92**

_J. E. Dun_                     Det V R Gordon
Judge, The Recorder's Court of Chatham County          (Deponent)

Sec 27 103 & 27-103-1 &

---

GEORGIA, CHATHAM COUNTY

To the Sheriff of Chatham County and his lawful Deputies, all and singular the Sheriffs of this State and their lawful deputies, lawful C stables of this State, the officers of the Chatham County Police Department, the officers of the Police Department of the City of Savannah other municipalities in Chatham County, the State Patrol and all other law enforcement officers and agents of this State Greeting

**DET. V.R. GORDON** makes oath before me that on the **11th** da
(Name of Deponent)

**August**, in the year 19 **92** the county aforesaid **James Clifford Williams,**
(Name of Defendant)

did commit the offense of **Trafficking in Cocaine, in violation of GA State Code 16-13-31(a)**

at approximately **1:30** XXXX (P M ) at **326 Linwood Dr., Savannah, Chatham County, GA**

against **State of Georgia** by **Trafficking in Cocaine, in violat**
(Name of Victim)

**GA State Code 16-13-31(a)**
(Repeat what is in deponent's affidavit)

Sav , Ch Co

You are therefore commanded to arrest the body of the said **James Clifford Williams, Jr.**
(Name of Defendant)

and bring him before me or some other judicial officer of this State, to be dealt with as the law directs Herein fail not

Sec 27 105                     _J. E. Dun_
Judge, The Recorder's Court of Chatham County

---

STATE OF GEORGIA
CHATHAM COUNTY

I have this day executed the foregoing warrant **13 AUG** 19 **92** at **9:00** (A M)

V. R. Gordon
Det G P D S
Title of Officer

---

GEORGIA, CHATHAM COUNTY

having been arrested on a warrant for the offe
(Name of Defendant)

and brought before me, after hearing evidence it is ordered that he be committed for trial for the offense of

And the jailer of said county is required to receive and safely keep him until discharged by due process of law

It is further ordered that said defendant be allowed to bind himself with sufficient securities in a bond of

Dollars for his appearance at the present term or succeeding term of thereafter of the State Court of Chatham County and/or the Superior Court of Chatham County, Georgia to be held in and for said Coun the matter shall be finally disposed of as provided by law, in which event he shall be released from being held in jail to answer the said

Witness my hand and seal this _____ day of _____ 19

Sec. 27-109

Judge, The Recorder's Court of Chatham County

THE RECORDER'S COURT OF
CHATHAM COUNTY, GA

**Witnesses for the State**

Name _____ Det. V. R. Gordon

Residence MDS _____

Name _____ Det. J. A. Pierce _____

Residence MDS _____

Name _____

udence State Crime Lab

Name _____

Residence _____

Name _____

Residence _____

Name _____

Residence _____

Name _____

Residence _____

Name _____

Residence _____

Name _____

Residence _____

Name _____

Residence _____

Attorney for State

# CRIMINAL WARRANT

# THE STATE

vs

James Clifford Williams, Jr. _____

Residence  401 Montgomery Crossroads, #C-8,
Savannah, Chatham County, GA

Color  B  Sex  M  Age  11/29/65

Trafficking in Cocaine, 16-13-31(a)

Charged with

(Name of Offense)

Attorney for Defendant

Request

Jury _____ Non-Jury _____

Amount of Bond

Bondsman

Time and Date Bond Posted and Defendant Released

Time _____ (A M )(P M )

## THE RECORDER'S COURT OF CHATHAM COUNTY

I _____ have been advised that I am being

charged with

and that the maximum punishment that I can receive is 12 months imprisonment and/or a $1,000.00 fine

and that the minimum punishment I can receive is a su pended fine and/or a suspended term of imprison

ment or a sentence of probation  I have been advised of my rights to be represented by counsel and have

counsel appointed to represent me if I am indigent, plead not guilty and be tried by a jury or a judge, con

front the witnesses against me, and not give incriminating evidence against myself  I hereby waive these

rights, state that I have not been induced by any threat or promise to enter this plea and do freely and

voluntarily enter my plea of Guilty

This _____ day of _____ 19 _____

Accused

I _____ Judge of the Recorder's Court of

Chatham County have advised the above-named accused as indicated above of his rights, the nature of

the charges against him and the possible consequences of the plea as entered  I am satisfied that there is a

factual basis for the guilty plea which the accused has entered and that it was entered freely and volun

tarily with understanding of the nature of the charge and the consequences of the plea

JUDGE

SEARCH WARRANT

RECORDER'S COURT OF
CHATHAM COUNTY

GEORGIA, CHATHAM COUNTY

To the Sheriff of the Superior Court of Chatham County and his lawful Deputies,

singular the Sheriffs of this State and their lawful Deputies, lawful Constables of th

the officers of the Chatham County Police Department, the officers of the Police Departm

City of Savannah, the State Patrol, and all other law enforcement officers and agents a

to serve search warrants.  Greeting:

Whereas ___Det. J. A. Pierce_____

sworn to, and subscribed the foregoing affidavit in order to obtain a warrant to search

of ___James Williams aka Swinger_____

and the premises known as (vehicle) 326 Linwood Road, Savannah, Chatham County, Georg
to include all rooms, attics, hallways, closets and curtilages of said residence.  Se
include all persons present at time of warrant execution who may reasonably be involv
crime of possession of illegal drugs or narcotics.  Search to also include all papers
ments which may be involved.  The residence of 326 Linwood Road is described as a sin
brick dwelling with black blinds inside the windows, SAVANNAH

Chatham County, Geo
for the possession (sale) of CONTROLLED SUBSTANCE, COCAINE, IN Vio. of O.C.O.G. 16-1
and papers and documents which are evidence of Cocaine distribution,

in violation of the laws of Georgia; and whereas _____

_____ and _____

ha____ made, sworn to, and subscribed the foregoing affidavit (s) in support of the af

_____

It is the finding of the undersigned, and it is hereby so found and held, that pro

has been shown under oath and in writing for the undersigned to believe that the pro

described, and that the foregoing grounds for application for issuance of a search w

been established.

Therefore, you are hereby commanded to search forthwith the person named and pr

(vehicles) described for the property specified, and to make such search in the day t

time in the day or night).  If you find said described property, or any part thereo.

execution of this warrant, seize the same, together with any discovered item, substa

thing, or matter whose possession is unlawful under the laws of Georgia or which is

evidence of the commission of a crime, and which may be seized under existing law.

defendant a copy of this warrant and a receipt for the property taken, prepare an inver

seized property, and return this warrant to me within ten days from this date, as requ

This day 11th day of __August_____, 19 92 at /0:5 6 o'clock __a__ M.

Judge, Recorder's Court
Chatham County

RETURN

After receiving the foregoing search warrant on _August 11_,

executed it as follows:

On _11th_ day of _August_, 19 _92_ at _1:05_ o'clock _P_ M.

I searched the person named and the premises (vehicle) described in the warra

I left a copy of the warrant with _James Williams_

together with a receipt for the items seized.

The following is an inventory of property taken pursuant to the warran

1. Two plastic Zip-loc baggies containing white powder

2. Two Beep one pagers found on James Williams

3. One set of Triple beam scales w/ white powder residue

4. Two pieces of paper w/ handwritten notes

5. One potato chip can w/ false bottom containing plastic baggies

6. Several scraps of paper w/ handwritten notes

7. Two Beep one pagers from master bedroom

Continued on next sheet

This inventory was made in the presence of _James Williams_

I swear that this is a true and detailed inventory of all the property.

Sworn to and subscribed before me this _____ day of _____, 19_____

_____

**Judge, Recorder's Court**
**Chatham County**

NO.

RECORDER'S COURT OF CHATHAM COUNTY

SEARCH WARRANT

THE STATE

Versus

JAMES WILLIAMS AKA SWINGER

Location of Premises 326 LINWOOD ROAD SAVANNAH, CHATHAM COUNTY, GEORGIA. DESCRIBED AS A SINGLE STORY BRICK DWELLING WITH BLACK BLINDS INSIDE THE WINDOWS.

Det. J. A. Pierce, Metro Drug Squad **Deponent**

Chatham County Police Department **Evidence**

INVENTORY LIST

| ITEM NUMBER | ITEM DESCRIPTION | WHERE FOUND |
|---|---|---|
| 8 | city stub in name Felicia Rutledge | night stand master bedroom |
| 9 | Misc. bills & Receipts | night stand master bedroom |
| 10 | Misc bills & Receipt from Dresser drawer | master bed |
| 11 | Two photographs | |
| 12 | Date organizer | middle Bedroom |
| 13 | Misc Photographs | closet master bedroom |
| 14 | Misc papers from leather pocket book | master bedroom |
| 15 | Misc papers | Dresser middle bedroom |
| 16 | Day organizer w/ handwritten Notes | Top of T.V living room |
| 17 | Plastic baggies | C.D case middle bedroom |
| 18 | A/c duct Plastic baggies | A/c duct Hall closet |
| 19 | Misc. photos from photo Album | closet Hall middle bedroom |
| 20 | paper w/ handwritten notes | Top of Refrig kitchen |
| 21 | Photo from photo album | living Room |
| 22 | Envelope w/ handwritten phone Number | Top of Refrig kitchen |
| 23 | Notebook w/ handwritten figures | Living room under T.V |
| 24 | ID card in name of Felix Patric's Williams | Dresser master bedroom |
| 25 | Calendar book w/ handwritten Notes | Dresser master bedroom |

Nothing Follows

| REPORT OF INVESTIGATION | 1 FILE NO | 2 G DEP IDENTIFIER |
|---|---|---|
| *(Continuation)* | G9-91-0012 | KA2-C1 |

| | 3. FILE TITLE |
|---|---|
| 4.      Page 2 of 4 | HARRINGTON, Matthew |

| 5 PROGRAM CODE | 6 DATE PREPARED |
|---|---|
| N/A | August 17, 1992 |

9. This homicide was to have occurred in the early part of last year at DANNYS AUTO BODY SHOP, located on Staley Avenue across from the Cash and Carry. Persons involved were Danny KELTON, James WILLIAMS (AKA SWINGER) and DEA CI SG9-92-X022. The person murdered was KELTON's partner (SPIVEY).

10. Around 5:00 or 6:00 pm, the mechanic at the shop (FRANK LNU) was sent home. James WILLIAMS and KELTON were in the print shop talking with SPIVEY. James WILLIAMS came into the trailer where the CI was sitting. James WILLIAMS told the CI to lock the back gate. As the CI was returning through the trailer, he/she heard a pop and knew someone had been shot. The CI continued through the trailer into the shop area. KELTON was walking out of the paint stall removing a pair of gloves and saying "I told him not to fuck with me" repeatedly. KELTON gave the gun (possibly a .38) to James WILLIAMS. James WILLIAMS busted the gun up, putting parts in the sewer in front of the body shop. The remaining parts were thrown along I-16. The CI observed SPIVEY face down on the floor, lying on plastic used for paint drippings. SPIVEY had been shot in the head. James WILLIAMS rolled SPIVEY over onto a blue tarp and told the CI to get the red Volvo Station Wagon and back it up to put the body in.

11. KELTON drove SPIVEY's truck to the airport and checked it into the long-term parking area. KELTON then got into a red truck (a Sierra with tinted windows that also belonged to SPIVEY) with James WILLIAMS and the CI following them driving the Volvo Station Wagon. They drove around for a while trying to locate a place to dump SPIVEY's body. James WILLIAMS finally went to an old shack in Bloomingdale (believed to be WILLIAMS' relatives land) and stopped. James WILLIAMS and KELTON removed the body from the Volvo, the CI

DEA Form - 6a (May 1980)    8/17   st

DEA SENSITIVE DEFENSE COUNSEL

DRUG ENFORCEMENT ADMINISTRATION

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency.

Previous edition may be used

THIS REPORT IS SUBMITTED TO _____ PURSUANT TO THE PROVISIONS OF TITLE 18 U.S.C. 3500 BY AUSA _____ RECEIVED BY _____

(Exhibit - K)

| REPORT OF INVESTIGATION<br>*(Continuation)* | 1. FILE NO.<br>09-93-Z001 | 2. G-QCP IDENTIFIER |
|---|---|---|

**3. FILE TITLE**

HARRINGTON, Matthew

**4.**    Page  2  of  3

**5. PROGRAM CODE**
N/A

**6. DATE PREPARED** June 21, 1993

resided with a Mike WIGGINS at Island Tree Apartments for approximately one to two years. KELTON stated that he owned a burgundy Chevrolet Camero and also drove a red pickup truck that belonged to Rick SPIVEY.  KELTON stated that the red pickup truck was purchased at Dan Vaden in Savannah, GA.

6.  KELTON stated that James WILLIAMS, Carl DOUGLAS, Enrique RUTLEDGE, Parrish SHIELDS and an individual named BARSHAWN all were in possession of crack cocaine that was sold out of DANNY'S AUTO BODY SHOP.  KELTON stated that the following individuals worked for him at DANNY'S AUTO BODY SHOP:

Mike FISHER
Ken MCDUFFY
Tom RAMSEY
Joey KELTON
Tyrone ARKWRIGHT
Chris GAINES

7.  KELTON stated that Joey KELTON (Danny KELTON's brother) was possibly selling crack cocaine for Carl DOUGLAS (AKA "B") along with his close friend, Chris GAINES.  KELTON stated that all the above listed workers except for Tyrone ARKWRIGHT were users or seller of crack cocaine.  KELTON stated that he never sold crack cocaine at the Body Shop but knew that James WILLIAMS and his associates were distributing crack cocaine.

8.  KELTON stated that James WILLIAMS would use the phone at DANNY'S AUTO BODY SHOP in order to contact people from New York and Miami.  KELTON stated that he rented cars for WILLIAMS from Budget and Hertz located in Savannah, GA.  Usually, KELTON would rent a Lincoln Continental using either his Ammoco credit card or a Master Card credit card. KELTON stated that in conversations with WILLIAMS, WILLIAMS told KELTON about the early years when WILLIAMS was selling crack cocaine from crack houses that he had set up throughout Savannah, GA.  KELTON stated that anywhere between 20 and 30 people would visit the shop in order to buy crack cocaine on a daily basis.  KELTON stated that he was told by WILLIAMS that approximately $7,000.00 to $8,000.00 was taken while down in the Florid area.

9.  KELTON identified Matthew HARRINGTON from a photograph shown to him by S/A Smith and stated that HARRINGTON had "B"n at DANNY'S AUTO BODY SHOP meeting with WILLIAMS.

INDEXING SECTION

1.  HARRINGTON, Matthew, AKA Red, NADDIS 3920023

2.  WILLIAMS, James, AKA Swinger, NADDIS 3143618

DATE: _____ **THIS REPORT IS SUBMITTED**
DEFENSE COUNSEL _____ **PURSUANT T**
THE PROVISIONS OF TITLE 18 U.S.C. 3500 BY AUS
RECEIVED BY _____

**DEA SENSITIVE**

DRUG ENFORCEMENT ADMINISTRATION

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency to which loaned.

Previous edition may be used.

(Exhibit L)

**U.S. Department of Justice**
Drug Enforcement Administration

| | | |
|---|---|---|
| **REPORT OF INVESTIGATION** (Continuation) | **1. FILE NO.** G9-93-Z001 | **2. G-DEP IDENTIFIER** INC31 |
| | **3. FILE TITLE** HARRINGTON, Matthew | |

**4.** Page 4 of 6

| **5. PROGRAM CODE** N/A | **6. DATE PREPARED** December 2, 1993 |
|---|---|

1. Back in 1988, KELTON worked at CD Precison Paint and Body Shop. Robert E. FUTCH (AKA Bubba) and Ricky SPIVEY also worked with KELTON at this shop. While working at this shop, KELTON was working with Bubba DIASS and Wayne BENNETT. KELTON and SPIVEY were partners and were responsible for stealing cars for the chop shop operation. KELTON stated that he had stolen about twenty cars himself but knew of approximately thirty to forty stolen vehicle. KELTON stated that SPIVEY was responsible for handling the title paper work concerning the stolen vehicles.

2. During the fall of 1990, KELTON and SPIVEY moved to Staley Avenue at DANNY's AUTO BODY SHOP. While at this shop, KELTON and SPIVEY continued their chop shop operations along with DIASS and others. KELTON stated that the following personnel and banks were working with them in this operation:

| | |
|---|---|
| Raleigh BACON | First Union |
| David CARTER | First Atlanta, Pooler, GA |
| Tim BUTTIMER | Georgia Federal |

3. Most of the car business, to include loans and checks, were handled with the above listed banks. KELTON stated that at least one million dollars went through Raleigh BACON at First Union. KELTON stated that the following individuals did business with them in the transfer, sales, destruction, title changes, and Vin alterations for the stolen cars:

| | |
|---|---|
| Jimmy CRIBBS | JC Lewis Ford |
| Grant CORSEY | JC Lewis Ford |
| Mike BLANCHARD | Savannah Toyota |
| Chris NEWTON | Savannah Toyota |
| George GRADY | Savannah Toyota |
| Tracy MASON | Mason Used Cars |
| Leonard MASON | Mason Used Cars |
| Johnson TAYLOR | Sgt Savannah PD |

4. KELTON stated that back in March of 1990, KELTON and SPIVEY put approximately $50,000.00 into the Hollywood's Club in order to start a kitchen venture with the club. This business venture failed and only lasted several months.

5. KELTON stated that he had a .357 gun that he got from Ricky SPIVEY who got the gun from Bubba DIASS. Around November 1990, KELTON was tired of SPIVEY because SPIVEY was under a lot of pressure to pay back loans to the bank. Because of this, SPIVEY wanted KELTON to give him almost every dime he made from the business. SPIVEY was also after Bubba DIASS to repay certain monies. KELTON stated that he purchased a shot gun from Big Toms Pawn Shop in order to kill Ricky SPIVEY.

DEA Form - 6a 12/14 st    DEA SENSITIVE    DRUG ENFORCEMENT ADMINISTRATION
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency to which loaned.
Previous edition may be used

(Exhibit-M)   00337

U.S. Department of Justice
Drug Enforcement Administration

| | | 1. FILE NO. | 2. G·DEP IDENTIFIER |
|---|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | G9-93-Z001 | INC31 |
| | | 3. FILE TITLE | |
| | | HARRINGTON, Matthew | |
| **4.** Page 5 of 8 | | | |
| **5. PROGRAM CODE** | | **6. DATE PREPARED** | |
| N/A | | December 2, 1993 | |

6. In December of 1990, WILLIAMS tells KELTON that he could get rid of Ricky SPIVEY for $1,000.00. KELTON had a meeting with Bubba DIASS who also wanted to get rid of SPIVEY to discuss the possible set up. DIASS tells KELTON that he will pay for the killing of SPIVEY but first wants to meet with WILLIAMS. KELTON sets up a meeting with DIASS at the shop located on Staley Avenue. KELTON tells WILLIAMS later after the meeting that DIASS was that person who was going to pay for the hit on Ricky SPIVEY. Two days later, KELTON got $1,000.00 from DIASS for payment to WILLIAMS.

7. On or about December 26, 1990, while KELTON and SPIVEY are talking in the paint stall of the body shop, James WILLIAMS walks up behind SRIVEY and shoots SPIVEY in the back of the head, killing him. Immediately after the shooting, WILLIAMS tells Bruce JOHNSON, who just came inside the shop, to get the tarp to place SPIVEY's body in. Both WILLIAMS and JOHNSON place the body of SPIVEY into a red Volvo that was parked outside the shop area. Before placing the body into the car, they placed paper on the windows to hide the back area of the stationwagon. A water hose was used to clean up the blood in the shop area. After this, it was decided that KELTON would drive SPIVEY's silver truck out to the Savannah Airport to indicate that SPIVEY took a trip. WILLIAMS drove the red truck and JOHNSON drove the red Volvo with SPIVEY's body inside

8. After driving a couple of different places as directed by WILLIAMS, all of them ended up on a dirt road in Bloomingdale, GA. KELTON said that WILLIAMS threw the gun out on the driver side window into the median of Interstate 16. The gun was a short barrel black revolver. Once on the dirt road, they put SPIVEY's body in a ditch and covered him up. Two nights later, they went back to the ditch to cover up the body with more rocks and soil that was purchased by JOHNSON. KELTON called Bubba DIASS the next day and told him what had happened and KELTON stated that both Bubba DIASS and Dana RUTLAND came over to the shop on Staley Avenue along with a couple of other individuals. While at the shop, both DIASS and RUTLAND were armed with firearms. DIASS wanted everything that belonged to Ricky SPIVEY to include money, papers, cars, car parts, etc. DIASS told KELTON not to tell anyone about what had happened to SPIVEY.

9. After the murder of SPIVEY, KELTON started working for a windshield service company located on Papy Street, Savannah, GA. Working with KELTON at the autoglass company was an individual named David SCROGGS (AKA Dave). SCROGGS worked closely with KELTON and also helped in the stealing of glass for their company. KELTON stated that SCROGGS knew Raymond WOODBERRY and that WOODBERRY would provide SCROGGS with information about certain law enforcement activities conducted in Savannah. KELTON was told by SCROGGS that the police were looking at KELTON for the murder of Ricky SPIVEY and the selling of drugs. KELTON met with WOODBERRY who talks about a current investigation on the SPIVEY murder and the selling of drugs. KELTON was told that WOODBERRY was an investigator for the District Attorney's Office in Savannah. KELTON said that SCROGGS would frequently contact WOODBERRY to learn about certain activities conducted by the police and the DEA.

**DEA SENSITIVE**
DRUG ENFORCEMENT ADMINISTRATION
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency to which loaned.

Previous edition may be used

DATE: _____   **THIS REPORT IS SUBMITTED TO**
DEFENSE COUNSEL _____ PURSUANT TO
THE PROVISIONS OF TITLE 18 U S C
RECEIVED BY 0033C

91020072

## INVESTIGATIVE SUMMARY

ON WEDNESDAY, 6 MARCH 199, AT APPROXIMATELY 11:59 AM., THIS
OFFICER INTERVIEWED BUBBA DAISS AT THE BLOOMINGDALE POLICE DE-
PARTMENT, BLOOMINGDALE, CHATHAM COUNTY, GEORGIA.  THE INTERVIEW
WAS RECORDED ON TAPE #2, SIDE A, 259-280 AND HAS BEEN MADE A
PERMANENT PART OF THIS CASE FILE.

MR. DAISS STATED, ESSENTIALLY, THAT HE DID NOT KNOW OF ANYTHING
FACTUAL CONCERNING RICKEY'S DEATH AND COULD NOT CONTRIBUTE
ANYTHING TO THE CASE.  THIS OFFICER CONCLUDED THE INTERVIEW AT
APPROXIMATELY 12:05 PM., SAME DATE.


030791/dhs                    ID DATA:   MR. LAWRENCE R. DAISS III
                                         2608 TREMONT RD.
                                         DAISS COLLISION CENTER
                                         SAV'H, GA
                                         232-8811

( Exhibit - N )